# Illinois Official Reports

## Appellate Court

---

### *People v. Figueroa*, 2020 IL App (2d) 160650

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICARDO FIGUEROA, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-16-0650 |
| Filed | February 27, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 13-CF-268; the Hon. C. Robert Tobin III, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded with directions. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Yasemin Eken, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Tricia L. Smith, State's Attorney, of Belvidere (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Burke and Bridges concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a trial in the circuit court of Boone County, a jury found defendant, Ricardo Figueroa, guilty of three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2012)), two counts of attempted first degree murder, unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)), and mob action (720 ILCS 5/25-1(a)(1) (West 2012)). The jury further found that defendant committed the offenses of first degree murder and attempted first degree murder while armed with a firearm. The court sentenced defendant on five of the seven counts to an aggregate of 60 years in prison. Defendant appeals. For the reasons that follow, we reverse defendant's conviction of unlawful possession of a firearm by a street gang member. Pursuant to Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), we reduce that conviction to aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2012)), and we remand the matter to the trial court for sentencing on that offense. We affirm the court's judgment in all other respects.

¶ 2                                    I. BACKGROUND

¶ 3 The State's theory of the case is that the shooting resulting in defendant's convictions was precipitated by a gang rivalry between the Sureño 13s and the Latin Kings. Giovanni Galicia, Jesus Casas, and Fermin Estrada were all members of the Sureño 13 street gang. Around midnight on November 29, 2013, going into the early morning hours of November 30, they arrived together at Estrada's girlfriend's apartment in an area of Belvidere known as "Little Mexico." Galicia was in the driver's seat of his Chevrolet Impala, Casas sat in the front passenger seat, and Estrada sat in the back behind Casas. A Lincoln Navigator arrived on the scene. Two armed men exited the Navigator. One of them approached the driver's side of the Impala, and the other approached the passenger side. Casas saw the man on the passenger side tap on the window with a revolver, whereas Estrada saw that man tap on the window with his hand. The man on the driver's side opened fire repeatedly on the vehicle, killing Galicia. Neither Casas nor Estrada was injured. The suspects returned to the Navigator and left the scene.

¶ 4 Shortly after the shooting, a police officer saw a Navigator driving in the direction that he believed the perpetrators might be traveling. When the officer began following the Navigator, the driver of the Navigator, Ricardo Garcia, led him on a high-speed chase through Boone and Winnebago Counties. The Navigator eventually stopped in Rockford after sustaining damage during the pursuit. The occupants of the Navigator fled on foot. Police officers arrested Garcia, Cheyanne Patton, and defendant in a nearby field. Anthony Perez was arrested later, after the police had an opportunity to interview the other suspects and the witnesses.[1] Inside the Navigator, officers found certain incriminating evidence, including a .40-caliber Glock 22 handgun that was later determined to be the murder weapon. The police also noticed a revolver lying in the street by the Navigator.

¶ 5 Several hours after the shooting, two detectives interviewed defendant. The interview was videotaped. The video was played for the jury in its entirety, except for (1) portions where defendant was alone in the interview room and (2) the very end of the video when they

_____

[1]Garcia, Perez, and defendant were all charged with various offenses arising out of the events of November 29-30, 2013. They were tried separately. Patton was not charged.

discussed charges and bond. Defendant provided conflicting accounts of his whereabouts and actions that evening. In his initial accounts, he claimed that he did not know why a police officer attempted to stop Garcia's Navigator or why Garcia would not pull over in response to the officer's attempt to stop him. Defendant also said that, to his knowledge, only Garcia and Patton were in the Navigator with him.

¶ 6    Defendant changed his story amidst the detectives' questioning. He divulged more information and began to implicate himself. For example, he told the police that Perez was a fourth occupant of the Navigator and that the group drove to Little Mexico to "go see who's out there." Defendant at one point claimed that Perez got out of the Navigator in Little Mexico while Garcia, Patton, and defendant drove around the area. Defendant's understanding was that, if Perez saw somebody, defendant would "jump out and just whoop their ass, whatever." After Perez exited the vehicle, however, defendant heard multiple "pops." According to defendant, Perez got back in the Navigator and would not tell the others what had happened.

¶ 7    Defendant continued to change his story in ways that increasingly incriminated himself. In the next iteration of his story, he said that he knew that Little Mexico was where the Sureños hung out. He admitted that he got out of the Navigator and went up to the passenger side of a parked car "for a second." He said that he knocked on the window of that car with his hand and twice asked, "Who is you?" As he walked back to the Navigator, he heard "pops." Thinking that "they" were shooting at "us," he ran back to the Navigator. When the Navigator reached a stop sign, Perez got in the Navigator but would not tell the others what happened. Defendant said that he did not know if Perez was armed.

¶ 8    Defendant later incriminated himself even further. He testified that his group was at Mallek Sanchez's house that night and left to get beer. They were driving around and were mad because Sureños members had shot up Sanchez's house multiple times in recent months. They decided to go to Little Mexico. Perez suggested that he and defendant should get out on foot to "see who we can see." Defendant acknowledged that he had a revolver with him, which "was supposed to be" full of rounds. He told the detectives, however, that he did not intend to use the revolver. According to defendant, he was instead thinking that he and Perez would see if anybody was outside and, if so, they would "box" them (*i.e.*, a fistfight). Defendant explained that he and Perez exited the Navigator on foot and walked up to a car. Defendant went to the passenger side, and Perez went to the driver's side. Defendant knocked and asked the occupants of the car either "What you is?" or "Who is you?" Someone in the car waived his hands, as if to say, "I'm not nothing." Defendant started to walk away from the car. The car then went into reverse, and defendant heard 10 to 15 "pops." He assumed that Perez did the shooting. Defendant and Perez took off running. Defendant suspected that Perez had hit somebody or killed somebody. They got into the Navigator and went toward Rockford. A police officer then located the Navigator, and a chase ensued.

¶ 9    After questioning defendant, the detectives left the room, and defendant had an opportunity to sleep. The detectives returned and asked defendant if there was anything that they had talked about that he would like to change. Defendant responded that he had told them "damned near everything" that he knew. In response to further questioning, he clarified that only he and Perez had guns in the Navigator. He said that he first saw Perez's gun when they were getting out of the Navigator in Little Mexico. When questioned about the involvement of Garcia and Patton, defendant explained that everybody in his group had "some type of animosity" and resentment for Sanchez's house getting shot up. Defendant denied, however, that they were angry when

- 3 -

they left for Little Mexico. He agreed with one of the detectives that his train of thought was that he would "whoop somebody's ass." He denied that he intended to shoot anybody or that there was a "plan," other than to see who was out. He said that he brought his gun in the Navigator as a precaution.

¶ 10    After defendant had another opportunity to sleep, he told the detectives that "everybody knew" that Perez had a gun. Defendant assumed that the other occupants of the Navigator knew that defendant had one as well. Defendant said that their "plan" that night was "to go to the gas station, and on our way to the gas station, we were going to go by Little Mexico." A detective then asked defendant, "And the point of that was to see who was out?" Defendant responded, "To see who was out." The detective added, "To see what kind of shit you could get into?" Defendant responded, "basically."

¶ 11    The State presented 21 witnesses at trial. As defendant does not challenge the sufficiency of the evidence against him (apart from his arguments pertaining to the charge of unlawful possession of a firearm by a street gang member, which we will discuss separately in the analysis section), it will suffice to mention a few particularly important witnesses. Sergeant David Dammon of the Belvidere Police Department testified as an expert in street gangs. He explained that there was a rivalry between the Sureño 13s and the Latin Kings in Belvidere. He identified the victims of the shooting as members of the Sureño 13s, and he identified defendant, Perez, Garcia, and Patton as members of the Latin Kings. Estrada and Casas testified for the State and detailed their actions leading up to and following the shooting. The court granted the State's motion to give Casas use immunity for his testimony, as Casas was facing unrelated charges of possession of a firearm by a street gang member, and the prosecutor intended to question Casas at defendant's trial about his own gang affiliations.

¶ 12    Patton, who was the sole occupant of the Navigator who was not charged in connection with the events of November 29-30, 2013, also testified for the State pursuant to a grant of use immunity. Patton detailed her group's actions before and after the shooting. She testified that she and Garcia, who was her boyfriend at the time, attended a party at Sanchez's house in Belvidere. Defendant and Perez were there, and Patton saw Perez "[t]aking pictures with" a gun. Patton testified that she and Garcia decided to leave the party in Garcia's Navigator. As they were getting ready to go, Perez and defendant got into the back of the Navigator and said something about going to Little Mexico to "get at somebody." Patton testified that Garcia drove the group to Little Mexico, at which point Perez and defendant exited and asked Garcia to drive around the block. Patton heard gunshots. Perez and defendant ran back to the Navigator and got in the backseat. At that point, Perez had a gun in his hand and said, "I shot that n*** in his face." Perez and defendant told Garcia to drive to Rockford. They were followed by a police officer, their tires blew out, the Navigator came to a stop, and everybody ran.

¶ 13    Defendant elected not to testify in his own defense. He called two witnesses. A police officer testified that he was told that Garcia pointed a gun at another police officer immediately before the group fled on foot after the Navigator came to a stop in Rockford. Defendant also called Dammon to the stand to perfect the impeachment of Casas with respect to certain prior inconsistent statements.

¶ 14    The jury found defendant guilty of all charges and determined that, during the commission of the offenses of first degree murder and attempted first degree murder, defendant was armed with a firearm. A 15-year firearm enhancement made the sentencing range for first degree murder 35 to 75 years' imprisonment, which had to be served at 100%. The same 15-year

- 4 -

firearm enhancement made the sentencing ranges for the attempted murder convictions 21 to 45 years, which had to be served at 85%. The sentencing range for unlawful possession of a firearm by a street gang member was 3 to 10 years' imprisonment, to be served at 50%. The sentencing range for mob action was 1 to 6 years, to be served at 50%.

¶ 15    Defendant argued that the court should apply the firearm enhancement only to the sentence for first degree murder:

"Judge, I think that imposing a firearm sentencing enhancement on three counts, one first degree murder count and two attempt first degree murder counts, based on the simultaneous use or discharge of a single firearm amounts to cruel and unusual punishment that violates the proportionate penalties clause. It, in essence, creates a life sentence particularly where you're dealing with consecutive sentencing. It's a *de facto* life sentence which violates the proportionate penalties clause and flies in the face of the legislative intent behind the enhancement. The purpose of the enhancement is served by enhancing Count 1 [the first degree murder conviction]. It's unnecessary and unreasonable to enhance 4 and 5 [the attempted first degree murder convictions] for the very same firearm, the very same action."

The prosecutor responded that there were separate acts, with multiple gunshots and three victims, such that defendant was "subject to a separate firearm enhancement for each victim."

¶ 16    The trial court acknowledged defendant's argument but emphasized that, unlike many other states, Illinois has mandatory minimum sentences, firearm enhancements, truth-in-sentencing rules, and consecutive sentencing requirements that significantly restrict a court's discretion. The legislature has never desired to change this, and the constitutional argument against this sentencing scheme "hasn't had any real traction" for offenders, such as defendant, who are over 18 years old. The court rejected defendant's proportionate penalties argument and denied his request to eliminate the firearm enhancement on the two sentences for attempted first degree murder.

¶ 17    Notwithstanding that ruling, after discussing the statutory aggravating and mitigating factors, the trial court mentioned that defendant's age was an additional consideration, even though the eighth amendment's restrictions on sentencing juvenile offenders did not apply to adults:

"One [factor] that's not necessarily set out by statute in the factors in mitigation or I guess aggravation depending upon the person's age is, in fact, age. I don't find—the *Miller* trilogy [(see, *e.g.*, *Miller v. Alabama*, 567 U.S. 460 (2012))] is not required here because the defendant was 22 years old at the time of the offense; however, I am considering it because I don't think that 18 is necessarily some magical date where people acquire maturity, intelligence, and proper thinking. So I did look at the factors both that *Miller* set out in its trilogy as well as those eventually adopted by the general assembly and set out by statute. I gave some discount value to those based upon the fact that he's 22. He's not—this didn't occur a day after his 18th birthday. So I did consider those things."

The trial court sentenced defendant on five of the seven counts. The court sentenced defendant to 39 years in prison for first degree murder, 21 years for each count of attempted first degree murder, 10 years for unlawful possession of a firearm by a street gang member, and 6 years for mob action. The sentence for the one count of first degree murder was to run consecutively to the sentence for all other counts, which would run concurrently with each other.

¶ 18    Defendant timely appealed.

¶ 19                              II. ANALYSIS

¶ 20    Defendant raises four issues on appeal: (1) the trial court erred by allowing the State's motions to grant use immunity to Casas and Patton and by improperly restricting defendant's cross-examination on that issue, (2) defense counsel was ineffective for failing to request exclusion of certain portions of defendant's videotaped statement to the police, (3) the State failed to prove the elements of unlawful possession of a firearm by a street gang member, and (4) defendant's sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 21                  A. Use Immunity and Cross-Examination

¶ 22    Defendant presents his first issue in two parts. He argues that the court erroneously allowed the State's motions to grant use immunity to Casas and Patton because the State failed to establish that those witnesses either refused to testify or were likely to refuse based on their fifth amendment privileges against self-incrimination. Defendant then contends that the court improperly restricted his right to cross-examine Casas and Patton about their immunity. The State responds that the court correctly determined that Casas and Patton either refused to testify or were likely to refuse based on their fifth amendment rights. According to the State, defendant did not preserve his argument about the cross-examinations of Casas and Patton. Even so, the State maintains, the court did not restrict defendant's right to cross-examination.

¶ 23                            1. *Additional Background*
¶ 24                              a. Casas's Immunity
¶ 25    The trial in this matter was scheduled to begin on February 22, 2016. That day, the prosecutor initially indicated that the State was not ready for trial, given that two of its key witnesses, Casas and Estrada, failed to appear in court pursuant to subpoenas. The prosecutor requested leave to file petitions for indirect criminal contempt against Casas and Estrada. The prosecutor said that he was "not sure at this point how likely they are going to cooperate." The court allowed the State to file its contempt petitions and issued arrest warrants. After this colloquy, the prosecutor informed the court that the State's investigator had contacted Casas. The court took a 45-minute recess. When the court recalled the case, the prosecutor stated that both Casas and Estrada had been taken into custody.

¶ 26    On the next day, after the jury was selected, the prosecutor told the court outside of the jury's presence that Casas would be the State's first witness. The prosecutor said: "We're going to have to file a motion to just give him use immunity because he does have pending charges and there are some questions that are going to be asked of him." (As noted, Casas was facing two charges of unlawful possession of a firearm by a street gang member that were unrelated to the events of November 29-30, 2013; he was represented by attorney Al Kola in connection with those charges.) The prosecutor told the court that he spoke with Casas and Kola the previous night and learned that Kola was not going to be in court for defendant's trial. The prosecutor asked the court to speak with Casas outside the presence of the jury so the court could "inquire just to make sure that the Court knows he spoke to his lawyer yesterday." The

court indicated that the parties would present their opening statements and the court would then "kick the jury out" and make sure that Casas would testify.

¶ 27 Following opening statements, defense counsel indicated that she had just received a copy of the State's written motion for Casas's use immunity According to defense counsel, when the prosecutor handed her that motion just before opening statements, he said that he did not think that Casas would refuse to testify. Defense counsel argued that, if the prosecutor's statement were true, "this undertaking" (*i.e.*, granting use immunity) was unnecessary, as the use immunity statute provides for immunity only if a witness refuses or is likely to refuse to testify on the basis of his or her fifth amendment privilege against self-incrimination. The prosecutor responded:

> "I'm still going to ask [Casas] questions that are going to—that are going to elicit incriminating answers, and I need to give him immunity for those given the fact he's got pending charges so regardless of how you want to—you want to call it one thing or call it another, the fact of the matter is that we would be offering him that use immunity with regards to what he says.
>
> ***
>
> And besides that, Judge, this is our motion. They don't have a right to—"

Defense counsel then noted that, based on the wording of the statute, the State had no obligation to give Casas immunity if he did not refuse to testify or was not likely to do so. The court asked the prosecutor whether he had spoken with Kola about this issue, and the prosecutor responded in the affirmative.

¶ 28 After bringing the jury out and discharging them for the day, the court said:

> "Okay. I will advise Mr. Casas of his—initially of his Fifth Amendment rights of the use immunity and if he wishes—if the State is going to offer the use immunity, advise him that he then loses those rights and make sure he's had a chance to discuss his matter with his attorney and then we will bring him back and testify first thing in the morning."

Defense counsel asked the court whether Casas would be required to assert his fifth amendment privilege in front of the jury. The court responded:

> "Well, it depends. Let's see what he has to say and his basis. My understanding from the proffers by the State is that based upon communication with his attorney, they anticipate that he based upon being provided use immunity will, in fact, testify. In the event that he goes against his attorney's advice, I will—we'll have to address that outside of the jury's presence."

¶ 29 The court brought Casas into the courtroom and questioned him as follows:

> "THE COURT: *** We're going to start with your testimony tomorrow morning. I just want to let you know a couple things. One is that some questions may be asked of you tomorrow morning that may—the answers might incriminate yourself. Do you understand that?
>
> MR. CASAS: Okay.
>
> THE COURT: A little louder.
>
> MR. CASAS: I understand.

- 7 -

THE COURT: Secondly is have you had a chance to speak with your attorney about—about that issue?

MR. CASAS: Not too much. Am I going to be able to?

THE COURT: Have you had any discussions before today with Attorney Kola?

MR. CASAS: I spoke to him once.

THE COURT: Okay. And it's my understanding that the State is offering you what is called use immunity, meaning that your testimony cannot be used against you to prosecute you in further proceedings regarding this. Do you understand that?

MR. CASAS: I understand.

THE COURT: And based upon them offering you use immunity and your discussions with your attorney, Mr. Kola, do you intend to testify tomorrow morning or not testify?

MR. CASAS: I'm going to testify.

THE COURT: You are going to testify?

MR. CASAS: Yes."

¶ 30 After Casas left the courtroom, defense counsel reiterated her argument that there was no proffer by the State, and no indication from Casas's responses to the court's questions, that Casas either refused to testify or was likely to refuse, based on his right against self-incrimination. The prosecutor responded:

"Well, Your Honor, as the Court knows, the State has the full power to give someone [use immunity]. We can with the advice of counsel let [Casas] know that what he says will not be used against him. Only the State has that power. We have given not only the witness but the witness's attorney as well [the assurance] that whatever he says on that stand tomorrow will not be used against him in his pending case, et cetera, Judge, and it's been made absolutely crystal clear. And the State does have the power to do so. [Casas] simply is choosing to cooperate at this point."

The court then ruled:

"I'm going to find the State has met their burden. I will find that they have the ability to offer use immunity. They have done so. And that he is now based upon that in discussions with his attorney has decided to testify in consideration of that use immunity."

Defense counsel asked whether the court would require Casas to address his fifth amendment right in front of the jury. The court said "[n]o," so long as Casas chose to testify.

¶ 31 The discussion then turned to whether the jury should be apprised that Casas was testifying pursuant to a grant of use immunity. The prosecutor asked for the defense to be barred from addressing that issue on cross-examination, as it was not relevant. Defense counsel disagreed. The court ruled:

"I think the jury has a right to if—if they'd [the defense] want to, but at the same time I can't for the—again, I'm going to leave it up to you, but I can't for the life of me think why defense would want to bring up the immunity because if this is [Casas's] chance to say whatever could be culpable to him, I would guess that that [*sic*]—I don't know. I'll leave it up—it's trial strategy. But the fact that he's given immunity I think goes towards any bias, interest he may have in his testimony.

***

I don't think it's prejudicial or anything of that nature. So to the extent for trial strategy purposes you want to address that, that's a trial strategy issue and it would be allowable."

¶ 32 The next day, before Casas testified, the court reiterated that the State could not "flush out" on direct examination that Casas received immunity, as the court believed that such evidence "would be corroborating." The defense, however, could open the door by addressing the issue of immunity during cross-examination.

¶ 33 Consistent with the court's ruling, the prosecutor did not address the issue of immunity during his direct examination of Casas. The prosecutor did, however, elicit testimony from Casas that the state's attorney's office had not given him any promises or special consideration with respect to his pending charges in exchange for his testimony. On cross-examination, defense counsel questioned Casas about his immunity:

"Q. Mr. Casas, you have been given immunity though for your statements today, correct?

A. I don't know, I am not sure, but I believe so.

Q. [The prosecutor in the present case] is, in fact, in charge of the prosecution of your cases; is that correct?

A. I believe so.

Q. You have been in custody since Monday for failing to appear in response to a subpoena, correct?

A. Correct.

Q. How many times have you met with [the prosecutor] since you were taken into custody?

***

A. I believe like twice.

Q. And you expect to be released from custody after you testify here for [the prosecutor]; is that correct?

A. Correct."

On redirect examination, Casas testified that the prosecution gave him immunity for his statements in defendant's trial. He agreed with the prosecutor that he was in no fear of having his responses used against him and that he could testify freely. According to Casas, nobody forced him to testify and he in fact wanted to testify. Upon further cross-examination, Casas acknowledged that he failed to appear in court for this trial when he was subpoenaed.

¶ 34 We granted defendant's motion to supplement the record with the State's written motion to grant Casas use immunity, which the prosecutor tendered to defense counsel during the trial. In its motion, the State indicated that it intended to call Casas as a witness, that Casas had a pending criminal case in Boone County, and that the State believed that Casas would "assert his Fifth Amendment right against self-incrimination and refuse to testify in this matter."

¶ 35                                    b. Patton's Immunity

¶ 36 At the time of the trial, Patton was serving a prison sentence on charges that were unrelated to the events of November 29-30, 2013. Before jury selection, one of defendant's attorneys

informed the court that, the day before, Patton requested legal advice from her and cocounsel as to whether she had to testify. Defense counsel informed the court that she told Patton that she could not offer legal advice. Defense counsel stated to the court: "[Patton] needs to be advised before she's in front of the jury whether she's going to testify, not testify, what her rights are, [and] what her rights are not because that creates a problem if she's in front of the jury and decides that she's not going to testify and asserts the Fifth."

¶ 37     The court then asked the prosecutor if the State intended to offer Patton immunity for her testimony. The prosecutor responded:

> "We will—if she—we will have to offer her use immunity if she feels uncomfortable asking the—if she feels uncomfortable answering questions. We did go speak with her. She did indicate that there was some conversation about an attorney. I have a little bit of a different—my understanding is it was something else. But it's possible that she would—that she may or may not hesitate to that, but I did tell her as well that it's basically up to her but to let her know as well that the State at this point as far as if it goes that route, then I would have to ask the judge to entertain a motion."

The court and the parties then discussed whether the public defender's office could represent Patton. The prosecutor added that Patton had not asked him for an attorney when they spoke and that she was indeed "very cooperative." The court indicated that outside of the jury's presence, it would advise Patton of her rights, ask her whether she would testify, "kick it over to the State regarding use immunity," and, if necessary, appoint counsel for Patton.

¶ 38     Shortly before Patton testified, the bailiff informed the court that Patton was "all real emotional crying now." The prosecutor added that Patton was "scared" and "freaking out." The prosecutor mentioned that he intended to bring up on direct examination that Patton was not charged with any crime for her participation in the events of November 29-30, 2013, and that she was offered use immunity. The court immediately said, "State's motion to offer her use immunity is heard and granted." Similar to her opposition to Casas's use immunity, defense counsel objected that there was no basis to grant the State's motion for use immunity without either a proffer from the prosecutor or an indication from Patton that she refused to testify or was likely to refuse based on her right against self-incrimination. The prosecutor responded that, if the State could not raise the issue of use immunity on direct examination, defense counsel should not be allowed to raise it on cross-examination to paint the State in a bad light. The court said:

> "Outside of the jury's presence we'll confirm that she's testifying with use immunity. In the event that—I mean, at this point, clearly she would have a right to claim the Fifth but for the State's use immunity. There's no logical reason that she—that use immunity would be denied. There's no rational reason not to. And then State—as we did with the other ones [(*i.e.*, Casas)], State can't front the use immunity but if defense chooses to open the door, then State can use it at closing for purposes of bolstering the testimony of the witness."

Defense counsel asked whether the court would question Patton on the record outside the presence of the jury as to whether she was asserting her right against self-incrimination. The prosecutor interjected, "Judge, she doesn't have to." The court responded:

> "At this point—she doesn't have to. At this point I'll just let her know that she's got use immunity, verify that she's going to be testifying. If she says, no, I'm still not

going to testify, then we've got some contempt issues. But at this point, that's all that's necessary."

Defense counsel "respectfully disagree[d]" and renewed her objection.

¶ 39　　The court brought Patton into the courtroom and engaged in the following colloquy with her:

> "THE COURT: *** First of all, the State is offering you use immunity, which means that the State cannot use your statements here—your testimony here in court to prosecute you in regards to those statements. Do you understand that?
>
> THE WITNESS: Yes.
>
> THE COURT: Are you going to testify in this case?
>
> THE WITNESS: Yes.
>
> THE COURT: Okay."

¶ 40　　The prosecutor did not raise the issue of immunity during Patton's direct examination. As requested by defense counsel, the court took a recess between direct examination and cross-examination to allow counsel to confer with defendant as to whether the defense would address the immunity issue on cross-examination. Before reconvening, the court confirmed with defense counsel that she had "plenty enough time to discuss that" with defendant. On cross-examination, defense counsel impeached Patton by highlighting her criminal history; counsel did not elicit testimony that Patton had received use immunity.

¶ 41　　Subsequently, during the jury instruction conference, the State objected to giving the jury an instruction that would have suggested that Patton was an accomplice in connection with the events of November 29-30, 2013. See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17. 2014) (hereinafter IPI Criminal No. 3.17). During the parties' debate in connection with that instruction, the prosecutor initially denied that Patton was given use immunity. The court corrected the prosecutor, recalling that Patton was indeed given use immunity "and then defense decided not to comment on it." Defense counsel stated, "That's absolutely correct." In the context of discussing IPI Criminal No. 3.17, the court reiterated its belief that use immunity typically bolsters witnesses' testimony, as such witnesses can "purge all their sins *** without any consequences." Over the State's objection, the court ultimately gave the jury IPI Criminal No. 3.17.

¶ 42　　　　　　　　2. *Alleged Noncompliance With the Use Immunity Statute*

¶ 43　　Defendant argues that the trial court erroneously granted use immunity to Casas and Patton because the State failed to establish that those witnesses either refused to testify or were likely to refuse based on their fifth amendment privileges against self-incrimination. Defendant asserts that this issue is subject to *de novo* review. The State does not argue that a different standard of review is warranted.

¶ 44　　Illinois's use immunity statute provides, in relevant portion:

> "(b) *** [I]n any investigation before a Grand Jury, or trial in any court, the court on motion of the State shall order that a witness be granted immunity from prosecution in a criminal case as to any information directly or indirectly derived from the production of evidence from the witness if the witness has refused or is likely to refuse to produce the evidence on the basis of his or her privilege against self-incrimination." 725 ILCS 5/106-2.5(b) (West 2012).

- 11 -

The State has "the exclusive authority to grant use immunity," and "[t]he trial court's role is limited to examining the motion to determine whether the motion meets the procedural and substantive requirements of the use immunity statute." *People v. Ousley*, 235 Ill. 2d 299, 315 (2009). A court has no discretion to deny a motion for use immunity that meets the statute's requirements. *Ousley*, 235 Ill. 2d at 316.

¶ 45 On appeal, defendant maintains that use immunity is appropriate only when the State demonstrates a "need" to offer immunity. According to defendant, certain portions of the record show that the State did not need to grant immunity to Casas and Patton. In *Ousley*, however, our supreme court said that, because a court's role with respect to a motion for use immunity is essentially ministerial, "a court cannot decide whether a procedurally proper motion is necessary or advisable." *Ousley*, 235 Ill. 2d at 315.

¶ 46 In his reply brief, defendant contends that a different portion of *Ousley* supports his argument that the State must demonstrate its need to grant use immunity to a witness. Specifically, in the context of analyzing whether the appeal was moot, the court in *Ousley* considered whether a codefendant's guilty plea "waived his privilege against compulsory self-incrimination, so that the State no longer *needs* use immunity in order to compel [that witness's] testimony against his codefendants." (Emphasis added.) *Ousley*, 235 Ill. 2d at 306. "[A] judicial opinion, like a judgment, is authority only for what is actually decided in the case." *In re N.G.*, 2018 IL 121939, ¶ 67. Read in context, the "need" that the court mentioned in *Ousley* related to whether there was an active controversy, insofar as the court considered whether a witness's fifth amendment rights remained intact after pleading guilty but before the judgment was finalized. The court never suggested that, when a witness has a fifth amendment right not to incriminate himself, the State must prove its need before offering use immunity. As noted above, the court said the opposite: "[T]he court's role in considering a motion for use immunity essentially is ministerial, so that a court cannot decide whether a procedurally proper motion is necessary or advisable." *Ousley*, 235 Ill. 2d at 315.

¶ 47 Defendant notes that this court has said that "[a] grant of immunity under statutory authority must be in strict compliance with the terms of the statute [citation], since the removal of the privilege against self-incrimination by a grant of immunity is a matter which must be left to the legislature [citation], and which may only be accomplished by the legislature." *People v. Hamm*, 136 Ill. App. 3d 11, 23 (1985). Defendant proposes that *Hamm* also stands for the broader proposition that "immunity should not be granted where the witness's invocation of his or her fifth amendment right is based on speculation." Defendant's reliance on *Hamm* is unavailing because (1) it addressed a different immunity statute and (2) it is factually distinguishable. In *Hamm*, the defendant requested immunity for a potential witness whom the defense had not even bothered to subpoena. *Hamm*, 136 Ill. App. 3d at 25. The court reasoned that, absent a subpoena, there was no way of knowing whether this witness was likely to refuse to testify. *Hamm*, 136 Ill. App. 3d at 25. Here, by contrast, both Casas and Patton were under subpoena.

¶ 48 During oral argument, defense counsel proposed that the use immunity statute requires a witness to say on the record that he or she refuses to testify. Accepting defendant's argument would require us to read the language "or is likely to refuse" out of the statute, limiting use immunity to situations where a witness explicitly refuses to testify. We cannot embrace an interpretation that would render this statutory language meaningless. See *People v. McChriston*, 2014 IL 115310, ¶ 22.

¶ 49    *Ousley* establishes that the trial court's ministerial role includes "examining the motion [for use immunity] to determine whether the motion meets the procedural and substantive requirements of the use immunity statute." *Ousley*, 235 Ill. 2d at 315. Assuming *arguendo* that it is within the scope of a trial court's ministerial role to question the State's determinations as to whether a given witness is likely to refuse to testify on the basis of his or her fifth amendment privilege against self-incrimination, the record here supports the conclusion that, absent use immunity, Casas and Patton were likely to refuse to testify on the basis of their fifth amendment privileges.

¶ 50    The State's theory was that the November 2013 shooting related to a gang feud between the Latin Kings and the Sureño 13s. To establish defendant's motive, the State intended to ask Casas on the stand whether he was a member of the Sureño 13s. Casas had a clear constitutional right not to incriminate himself. See *Ousley*, 235 Ill. 2d at 306 ("Under the fifth amendment, a witness in a criminal case may refuse to answer questions which might incriminate him when he has reasonable cause to believe he might subject himself to prosecution if he answers."). By answering questions about his gang affiliation, Casas could incriminate himself in connection with his own pending charges for unlawful possession of a firearm by a street gang member. The prosecutor asserted in the State's written motion to grant use immunity that he believed that Casas would "assert his Fifth Amendment right against self-incrimination and refuse to testify in this matter." The prosecutor's belief was reasonable, considering the incriminating nature of Casas's anticipated testimony, Casas's failure to appear in court pursuant to the State's subpoena, and the fact that the prosecutor discussed the issue of immunity with Casas's attorney. The State's motion to grant Casas use immunity met the procedural and substantive requirements of the statute, so the court was obligated to accept it.

¶ 51    The record supports the conclusion that Patton also was likely to invoke her privilege against self-incrimination absent a grant of immunity. Although Patton was not charged in connection with the events of November 29-30, 2013, she was in close association that night with Garcia, Perez, and defendant—all of whom were charged with murder and other offenses. Unrepresented by counsel, Patton might testify to something that, whether she recognized it or not, subjected her to criminal liability under principles of accountability. See 720 ILCS 5/5-2(c) (West 2012) (A person is legally accountable for another's conduct when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense."). Indeed, the trial court determined that the evidence justified an accomplice instruction relating to Patton's testimony.

¶ 52    Furthermore, the record shows that Patton was reluctant to testify at defendant's trial. On the first day of the trial, defense counsel informed the court that Patton recently asked whether she had to testify. Several days later, immediately before Patton was scheduled to testify for the State, the bailiff informed the court that Patton was crying and "real emotional." The prosecutor confirmed at that time that Patton was "scared" and "freaking out." The State thereafter offered Patton use immunity. The record thus supports a conclusion that Patton was likely to refuse to testify on the basis of her right against self-incrimination.

¶ 53    For these reasons, we hold that the trial court did not err in granting the State's motions for use immunity.

- 13 -

¶ 54                              3. *Alleged Restrictions on Cross-Examination*

¶ 55       Defendant also contends that the court improperly restricted his ability to effectively cross-examine Casas and Patton about receiving use immunity. The State argues *inter alia* that defendant failed to preserve this issue.

¶ 56       In a criminal case, "a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or a contemporaneous trial objection, and (2) including it in the posttrial motion." *People v. Denson*, 2014 IL 116231, ¶ 11. During the trial, over the State's objection that the witnesses' immunity was irrelevant and should not be explored on cross-examination, the court ruled that the State could not broach the topic of immunity on direct examination but the defense could decide, as a matter of trial strategy, to open that door on cross-examination. The court reasoned that use immunity arguably bolsters a witness's credibility. Defendant maintains on appeal that the court's faulty reasoning caused defense counsel to underemphasize the impeaching value of use immunity when cross-examining Casas and Patton, but defendant never raised this specific objection at the trial. Defendant asserted in a single sentence of his posttrial motion that he "was limited in his cross-examination of the witnesses," but he never articulated why that was the case. Defendant thus forfeited this issue.

¶ 57       Forfeiture aside, defense counsel indeed cross-examined Casas on his receipt of immunity. The record also confirms that defense counsel decided, as a matter of trial strategy, not to cross-examine Patton on that issue.


¶ 58                              B. Defendant's Videotaped Statement

¶ 59       Defendant next argues that defense counsel was ineffective for failing to seek exclusion of certain portions of defendant's videotaped statement to the police. Defendant maintains that the following statements that he made during the interview were unrelated to the charged offenses and were more prejudicial than probative: (1) he had already been to jail and had a record, (2) the police already knew him and he had "a record in Belvidere," (3) he was a "double felon in Belvidere," (4) when he agreed to talk to the police in the past, he suddenly found himself "under arrest for aggravated battery, mob action, this, this [*sic*], and whatever," and (5) he did not like guns, which was why "all of [his] cases have been aggravated batteries." Defendant also contends that defense counsel was ineffective for failing to request the redaction of the following statements made by one of the detectives during the interview: (1) "You are caught up knee deep in it" and (2) "It's no different than if [the other detective] and I go decide to rob a bank together and I just drive the car and he goes in and shoots a teller and comes out and says don't worry about it, just drive." In defendant's view, with these statements, the detective improperly expressed an opinion that defendant "was guilty under an accountability theory."

¶ 60       The State responds that each statement that defendant identifies was admissible. Even if defense counsel provided ineffective assistance by failing to ensure the redaction of the interview, the State argues defendant was not prejudiced, as the evidence against him was "strong."

¶ 61       Prior to trial, defendant filed a motion *in limine* to bar evidence of his criminal history unless he testified at trial. At the hearing on this motion, defense counsel argued that defendant's videotaped statement should be edited to omit references to prior arrests, police contacts, and sentences. The prosecutor did not explicitly oppose the motion but simply said: "Judge, we will—if that's going to be the Court's ruling, then we'll have to figure out a way

and do that and fast forward. *** But the jury is going to see that we're fast forwarding something and—." Citing *People v. Patterson*, 2013 IL App (4th) 120287, and *People v. Mefford*, 2015 IL App (4th) 130471, the court ruled that it was not inclined to edit defendant's statement. The court explained:

> "I think that that *Mefford* case does a nice job of explaining why I think that the evidence that comes out especially with an interview such as this is admissible for— not for propensity purposes but also just to sort of explain the relationship between the defendant and the officers there."

The court invited defense counsel to distinguish *Patterson* and *Mefford*, but defense counsel never asked the court to revisit this issue.

¶ 62    Defendant failed to preserve his arguments with respect to editing the videotaped statement. To avoid this procedural bar, defendant frames his challenge under the rubric of ineffective assistance of counsel. To establish ineffective assistance, a defendant must show that "(1) counsel's performance was unreasonable, and (2) but for the error, there is a reasonable probability that the outcome would have been different." *People v. Theis*, 2011 IL App (2d) 091080, ¶ 39. Failure to satisfy either element defeats an ineffective-assistance claim. *Theis*, 2011 IL App (2d) 091080, ¶ 39. For purposes of the prejudice prong, "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Where a defendant fails to establish prejudice, the court need not determine whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

¶ 63    Even were we to agree that defense counsel was unreasonable in failing to pursue the redaction of the video, defendant has failed to demonstrate prejudice from the omission. Except for his conviction of unlawful possession of a firearm by a street gang member, which we address separately and reverse in the next section of this opinion, the evidence against defendant was overwhelming.

¶ 64    The jury found defendant guilty of Galicia's murder and the attempted murders of Casas and Estrada based on an accountability theory. Section 5-2(c) of the Criminal Code of 2012 (Code) provides that a person is legally accountable for another's conduct when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). The State can prove that a defendant possessed such intent by "present[ing] evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13. As we recently explained:

> "Pursuant to the common-design rule, if two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. [Citations.] Where a defendant voluntarily attaches himself to a group that is bent on illegal acts and he has knowledge of the group's design, this supports an inference that the defendant shared the common purpose and will sustain the defendant's conviction for an offense committed by another member of the group." (Internal quotation marks omitted.) *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 27.

Defendant does not dispute that Perez killed Galicia by firing numerous gunshots at the occupants of the Impala. Hours after the murder, defendant made statements to the police that established his accountability for Perez's actions. For example, defendant admitted that he knew that members of the Sureño 13 street gang hung out in Little Mexico. He admitted that he armed himself with a revolver as a precaution before his group drove to Little Mexico. He admitted knowing that Perez was likewise armed. He admitted that his intent was to "whoop" somebody, meaning to beat that person. He admitted getting out of the Navigator with Perez in Little Mexico and approaching the victims' car. Although defendant repeatedly insisted during the interview that he contemplated a physical confrontation that did not include the use of firearms, he was liable for Perez's acts that were committed in furtherance of their common design. See *Garcia*, 2019 IL App (2d) 161112, ¶ 34; *People v. Terry*, 99 Ill. 2d 508, 515 (1984) (where a group of men conspired to commit battery and the victim ended up being stabbed to death, all members of the group were accountable for the murder under the common-design rule). Defendant's own words established his liability for murder and attempted murder.

¶ 65        Defendant's admissions were corroborated by physical evidence. Defendant was arrested shortly after he and the other members of his group fled on foot from the Navigator. Defendant told the police that there were two guns in the Navigator: the revolver that he was carrying and the gun that Perez carried. Consistent with defendant's statement, when the police searched the Navigator, they found a .40-caliber Glock 22 on the driver's seat and a revolver nearby in the street. The Glock 22 was determined to be the murder weapon.

¶ 66        Defendant's admissions were also corroborated by Casas and Estrada, who testified that one of the perpetrators approached the driver's side of their Impala and the other approached the passenger side. Defendant's admissions were further corroborated by Patton's testimony, including that (1) her group drove to Little Mexico in a Navigator to "get at somebody," (2) defendant and Perez exited the Navigator shortly before shots were fired, and (3) when defendant and Perez returned to the Navigator, Perez was holding a gun and mentioned having shot someone in the face.

¶ 67        For the same reasons, the evidence supporting defendant's conviction of mob action was overwhelming. Mob action consists of "the knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a)(1) (West 2012). In the indictment, defendant was charged with committing mob action in that he

> "knowingly, by the use of violence, disturbed the public peace in the [*sic*] he, while acting together with two or more persons and without authority of law, approached an occupied motor vehicle while armed with a loaded firearm and displaying the firearm, knocked on a window of said motor vehicle to engage in a physical confrontation with the persons inside that vehicle."

Defendant admitted to the police that his group went to Little Mexico to engage in a physical confrontation. He admitted that both he and Perez were armed, he knocked on the window of the Impala, and he asked the occupants either "Who is you?" or "What you is?" As Dammon, the State's gang expert, testified, "Who is you?" meant "What gang do you belong with?" Defendant notes that he told the police that he knocked on the window with his hand. This was consistent with Estrada's testimony. Casas, however, testified that the person who approached the passenger side of the Impala knocked with a revolver. At one point during his interview, defendant told the detectives that, although he thought that his revolver was on safety and he

- 16 -

did not believe that he fired any shots, it was possible that he did so when he got spooked by the other gunfire. It is thus apparent that, irrespective of whether defendant knocked on the window of the Impala with his hand or with his revolver, he was carrying his revolver when he got out of the Navigator in Little Mexico.

¶ 68    Given the strength of the evidence against defendant, there is no reasonable probability that the outcome would have been different had the trial court redacted the handful of comments that defendant identifies from the police interview. There is no reason to believe that the jury convicted defendant based on his criminal history or because of one of the detective's isolated remarks in the course of a lengthy interview. Having failed to demonstrate prejudice, defendant's claim of ineffective assistance of counsel fails.

¶ 69                    C. Unlawful Possession of a Firearm by a Street Gang Member

¶ 70    Defendant next argues that the State failed to prove him guilty of unlawful possession of a firearm by a street gang member because it presented no evidence that the Latin Kings were a "street gang" as defined in section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/10 (West 2012)).

¶ 71    Defendant was charged with violating section 24-1.8(a)(1) of the Code, which provides:

> "(a) A person commits unlawful possession of a firearm by a street gang member when he or she knowingly:
>
> (1) possesses, carries, or conceals on or about his or her person a firearm and firearm ammunition while on any street, road, alley, gangway, sidewalk, or any other lands, except when inside his or her own abode or inside his or her fixed place of business, and has not been issued a currently valid Firearm Owner's Identification Card and is a member of a street gang[.]" 720 ILCS 5/24-1.8(a)(1) (West 2012).

The statute indicates that the term "street gang" has the meaning ascribed to it in section 10 of the Act. 720 ILCS 5/24-1.8(c) (West 2012). Section 10 of the Act defines "streetgang" as

> "any combination *** of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." 740 ILCS 147/10 (West 2012).

"Course or pattern of criminal activity," in turn, means:

> "2 or more gang-related criminal offenses committed in whole or in part within this State when:
>
> (1) at least one such offense was committed after [January 1, 1993];
>
> (2) both offenses were committed within 5 years of each other; and
>
> (3) at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony under the Criminal Code of 1961 or the Criminal Code of 2012." 740 ILCS 147/10 (West 2012).

According to defendant, although Dammon testified that the Latin Kings were a street gang, the State failed to establish that the Latin Kings engaged in a "course or pattern of criminal activity."

¶ 72    In their original briefs, the parties noted the split of appellate authority as to whether an expert's opinion that an organization is a street gang establishes that element of the offense where the State does not present specific evidence detailing the organization's "course or pattern of criminal activity." Compare, *i.e.*, *People v. Murray*, 2017 IL App (2d) 150599, ¶ 83 (explaining that the Second District's position was that "an expert on gangs may opine on the ultimate issue of whether an organization is a street gang engaged in a course or pattern of criminal activity without testifying to specific dates or incidents"), with *People v. Lozano*, 2017 IL App (1st) 142723, ¶¶ 42, 44 (a "course or pattern of criminal activity" is an element of the offense, so the failure of the State to introduce evidence proving that element requires reversal). On May 30, 2018, our supreme court allowed leave to appeal in *Murray*. We held the instant appeal in abeyance pending our supreme court's decision.

¶ 73    Our supreme court issued its decision in *Murray* on October 18, 2019. *People v. Murray*, 2019 IL 123289. In a fractured decision with no majority opinion, four justices agreed that the testimony of the State's gang expert (incidentally, Dammon) was insufficient to establish that the Latin Kings were a street gang, where there was no evidence that the Latin Kings engaged in a "course or pattern of criminal activity," as that phrase is defined in the Act. *Murray*, 2019 IL 123289, ¶ 53 (opinion of Neville, J., joined by Burke, J.); see also *Murray*, 2019 IL 123289, ¶ 63 (Kilbride, J., specially concurring, joined by Karmeier, C.J.). These four justices clarified that an organization's "course or pattern of criminal activity" is an element of the offense that the State must prove. *Murray*, 2019 IL 123289, ¶ 24 (opinion of Neville, J., joined by Burke, J.); see also *Murray*, 2019 IL 123289, ¶ 63 (Kilbride, J., specially concurring, joined by Karmeier, C.J.). In the absence of such evidence, these four justices agreed to reverse and vacate the defendant's conviction of unlawful possession of a firearm by a street gang member. *Murray*, 2019 IL 123289, ¶ 53 (opinion of Neville, J., joined by Burke, J.); see also *Murray*, 2019 IL 123289, ¶ 68 (Kilbride, J., specially concurring, joined by Karmeier, C.J.). The two justices who specially concurred diverged from Justice Neville's analysis to the extent that they believed that it was unnecessary to discuss the Illinois Rules of Evidence. See *Murray*, 2019 IL 123289, ¶ 59 (Kilbride, J., specially concurring, joined by Karmeier, C.J.) ("The critical question here is not the propriety of admitting the expert testimony but whether that testimony is sufficient to establish part of the State's *prima facie* case.").

¶ 74    We allowed the parties to file supplemental briefs addressing the impact of *Murray*. Defendant argues that *Murray* requires the reversal of his conviction of unlawful possession of a firearm by a street gang member.

¶ 75    The State agrees that *Murray* requires us to vacate the conviction but argues that this should be without prejudice to retrial. In so arguing, the State maintains that, in light of *Murray*, Dammon's opinion that the Latin Kings were a street gang "now lacks the required foundation." In this sense, the State asserts that the case at bar simply involves "improperly admitted opinion evidence." The State notes that, for purposes of determining whether double jeopardy bars a retrial, a court must consider both the properly admitted evidence and the improperly admitted evidence to determine whether a rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. Thus, the State reasons, because Dammon's opinion that the Latin Kings were a street gang was admitted at defendant's trial, albeit improperly, that opinion is still part of the mix for purposes of double jeopardy. Moreover, the State argues that it should not be penalized for trying this case within the confines of the Second District authority that governed at the time of the trial. In the alternative

to a retrial, the State asks us to reduce defendant's conviction to the lesser included offense of aggravated unlawful use of a weapon without a firearm owner's identification card (720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2012)).

¶ 76    Our supreme court's decision in *Murray* compels us to reverse defendant's conviction of unlawful possession of a firearm by a street gang member. Dammon's testimony in *Murray* was indistinguishable from his testimony here. As in *Murray*, the State failed to introduce any evidence to establish one of the elements of the offense, that the Latin Kings were a "street gang" in that they engaged in a "course or pattern of criminal activity."

¶ 77    We reject the State's suggestion that it may retry defendant on this charge. Quoting *People v. McKown*, 236 Ill. 2d 278, 311 (2010), the State asserts that, "[i]f the evidence presented at the first trial, including the improperly admitted evidence, would have been sufficient for any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt, retrial is the proper remedy." The very next sentence of that opinion, however, states: "If no rational trier of fact could so find, defendant may not be subjected to a second trial." *McKown*, 236 Ill. 2d at 311. Four justices in *Murray* agreed that the evidence was insufficient to sustain the defendant's guilt of the offense of unlawful possession of a firearm by a street gang member. As the special concurrence in *Murray* made clear, the problem was not that Dammon's testimony was inadmissible but rather that the State failed to prove the elements of the offense. See *Murray*, 2019 IL 123289, ¶ 59 (Kilbride, J., specially concurring, joined by Karmeier, C.J.) ("The critical question here is not the propriety of admitting the expert testimony but whether that testimony is sufficient to establish part of the State's *prima facie* case."). The same defect is present here. To cure this defect, the State seeks a retrial to introduce evidence that the Latin Kings engaged in a "course or pattern of criminal activity." The law is clear, however, that, where the evidence at the first trial was insufficient to support a conviction, double jeopardy precludes the State from retrying a defendant with "evidence that it failed to present at the first trial." *People v. Drake*, 2019 IL 123734, ¶ 20; see also *Burks v. United States*, 437 U.S. 1, 18 (1978) (double jeopardy precludes a second trial once a reviewing court has found the evidence legally insufficient).

¶ 78    We turn to the State's alternative request to impose a conviction on a lesser included offense. Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967) empowers a reviewing court to "reduce the degree of the offense of which the appellant was convicted." The appellate court's authority pursuant to this rule is "broad" and applies "even when the lesser offense is not charged and the State did not request an instruction on the lesser offense at trial." *People v. Kennebrew*, 2013 IL 113998, ¶ 25. In such a situation, the reviewing court applies the "charging instrument" approach. *Kennebrew*, 2013 IL 113998, ¶ 53.

> "Under the charging instrument approach ***, the lesser offense need not be a necessary part of the greater offense, but the facts alleged in the charging instrument must contain a broad foundation or main outline of the lesser offense. [Citations.] The indictment need not explicitly state all of the elements of the lesser offense as long as any missing element can be reasonably inferred from the indictment allegations. [Citation.] There are two steps to the charging instrument approach. First, the court determines whether the offense is a lesser-included offense. Next, the court examines the evidence at trial to determine whether the evidence was sufficient to uphold a conviction on the lesser offense." (Internal quotations marks omitted.) *Kennebrew*, 2013 IL 113998, ¶ 30.

¶ 79    The indictment alleged that defendant committed the offense of unlawful possession of a firearm by a street gang member in that he

"knowingly possessed on his person a firearm and firearm ammunition while on any land, at 2019 Lakeshore Drive, City of Belvidere, at a time when he was not inside his own abode, or inside his fixed place of business, and the defendant had not been issued a currently valid Firearm Owner's Identification Card and the defendant was a member of a street gang."

Section 24-1.6(a)(2), (a)(3)(C) of the Code provides:

"(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:

\*\*\*

(2) Carries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his or her own land or in his or her own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; and

(3) One of the following factors is present:

\* \*\*

(C) the person possessing the firearm has not been issued a currently valid Firearm Owner's Identification Card[.]" 720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2012).

¶ 80    Defendant concedes that aggravated unlawful use of a weapon was a lesser included offense of unlawful possession of a firearm by a street gang member under the charging instrument approach. Defendant also concedes that the evidence at trial was sufficient to uphold a conviction of aggravated unlawful use of a weapon. Defendant nevertheless appeals to this court's discretion *not* to reduce his conviction to a lesser included offense because the court in *Kennebrew* acknowledged that its decision involved "a very specific set of facts." *Kennebrew*, 2013 IL 113998, ¶ 25. This comment, however, was in the context of justifying the supreme court's decision to apply Rule 615(b)(3) where the State had not asked the appellate court to do so. Here, the State indeed asks us to invoke our authority pursuant to Rule 615(b)(3). Defendant also cites *People v. Guerrero*, 2018 IL App (2d) 160920, ¶ 71, in which we applied Rule 615(b)(3) *sua sponte*, "[g]iven the unique facts of this case and the compelling evidence that defendant is guilty of the lesser-included offense." Here, however, we are not applying Rule 615(b)(3) *sua sponte*.

¶ 81    Defendant also contends that the State has not shown that it would be necessary or in the interests of justice to impose a conviction on a lesser included offense. As our supreme court noted in *Kennebrew*, a defendant "has no right to an acquittal when the evidence, while insufficient to establish the greater offense, is sufficient to establish the lesser offense. To do otherwise would be unjust." *Kennebrew*, 2013 IL 113998, ¶ 43. We thus believe that it serves the interests of justice to impose a conviction on the lesser included offense here.

¶ 82    For these reasons, we reverse defendant's conviction of unlawful possession of a firearm by a street gang member. Pursuant to Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), we reduce that conviction to aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2012)), and we remand the matter to the trial court for sentencing on that offense.

¶ 83                        D. Proportionate Penalties Clause

¶ 84    For his final argument, defendant contends that the confluence of applicable sentencing statutes—specifically, mandatory firearm enhancements, consecutive sentencing requirements, and truth-in-sentencing rules—required the trial court to sentence him to a *de facto* life sentence. According to defendant, this sentencing scheme prevented the court from "constructing a sentence that was individualized to him, a young adult with rehabilitative potential who was not the principal offender in this case." Defendant maintains that, as applied to him, the sentences violate the proportionate penalties clause of the Illinois Constitution. See Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."). Defendant asks us to vacate his sentences, to remand the matter for resentencing, and to hold that the trial court "has discretion not to apply the mandatory enhanced sentencing provisions applicable here."

¶ 85    The State responds that defendant forfeited his challenge, given that he failed to fully develop the record in the trial court and failed to file a postsentencing motion. Further, the State contends, even considering the merits of defendant's challenge, defendant's aggregate sentence does not violate the proportionate penalties clause.

¶ 86    In *People v. Harris*, 2018 IL 121932, our supreme court explained that a reviewing court cannot address an as-applied constitutional challenge in the absence of a developed record that includes specific findings of fact by the trial court:

> "The distinction between facial and as-applied constitutional challenges is critical. [Citation.] A party raising a facial challenge must establish that the statute is unconstitutional under any possible set of facts, while an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party. [Citations.]
>
> All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review. [Citation.] *We have reiterated that*
>
> > *[a] court is not capable of making an as-applied determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact*. [Citation.] *Without an evidentiary record, any finding that a statute is unconstitutional as applied is premature*." (Emphasis added and internal quotation marks omitted.) *Harris*, 2018 IL 121932, ¶¶ 38-39.

The court in *Harris* rejected the notion that the basic personal information about the defendant that was discernible from the presentence investigation report provided a basis for evaluating his as-applied constitutional challenge. *Harris*, 2018 IL 121932, ¶ 46. The court declined to remand the matter for an evidentiary hearing but noted that the defendant could pursue his

claim either in a postconviction petition or in a proceeding pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). *Harris*, 2018 IL 121932, ¶ 48.

¶ 87 On appeal, in support of his as-applied proportionate penalties challenge, defendant emphasizes his relative youth, his difficulty escaping gang influences, his mental health issues, and his rehabilitative potential. Much of the information that he cites comes from his presentence investigation report. Defendant maintains that his circumstances "made him vulnerable to the same type of recklessness, impulsivity, and heedless risk-taking" as juvenile offenders who are given special consideration at sentencing.

¶ 88 At the sentencing hearing, however, defendant did not cite his individual characteristics as the basis for his proportionate penalties challenge. Nor did he analogize himself to a juvenile offender. Furthermore, he did not argue, as he does on appeal, that the trial court should have the discretion to decline to impose any of the statutory sentence enhancements. Defense counsel instead argued, in five sentences, that the firearm enhancement should apply only to defendant's murder conviction. In so arguing, counsel did not specify whether defendant was presenting an as-applied challenge to the sentencing scheme versus a facial challenge. Given that defendant did not rely on his individual characteristics as the basis for his argument, the court did not hold an evidentiary hearing on the proportionate penalties challenge and did not make findings of fact before rejecting defendant's argument. Defendant did not file a postsentencing motion.

¶ 89 Under these circumstances, the record was not sufficiently developed for us to consider the argument that defendant advances on appeal. *Harris* compels us to abstain from addressing defendant's premature as-applied constitutional challenge to his sentence. See also *People v. Vega*, 2018 IL App (1st) 160619, ¶ 57 (following *Harris* and finding that an as-applied proportionate penalties challenge was premature where (1) the defendant did not raise his claim in the trial court, (2) the trial court did not hold an evidentiary hearing on the matter, and (3) the trial court did not make findings of fact with respect to the issue). Consistent with *Harris*, we do not intend for our disposition to preclude defendant from advancing his claim through other available proceedings.

¶ 90                                    III. CONCLUSION

¶ 91 For the reasons stated, we reverse defendant's conviction of unlawful possession of a firearm by a street gang member. Pursuant to Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), we reduce that conviction to aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2012)), and we remand the matter to the trial court for sentencing on that offense. We affirm the judgment of the circuit court in all other respects.

¶ 92 Affirmed in part and reversed in part.

¶ 93 Cause remanded with directions.