2022 IL App (2d) 200419-U
No. 2-20-0419
Order filed July 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 CF 2123 |
| PERRIYON KING, | ) ) | Honorable Donna R. Honzel, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The evidence was sufficient to find the defendant guilty of attempted first-degree murder.  The trial court erred in imposing a 30-year firearm enhancement because the evidence only made defendant eligible for a 20-year enhancement.  Alleged hearsay testimony and a joint trial with codefendant did not prejudice the defendant.  The State did not commit error during closing argument.  The record is not sufficiently developed to address the defendant's claim that his sentence was unconstitutional as applied under the proportionate penalties clause.  The trial court did not consider improper factors in sentencing.  The defendant's conviction for aggravated battery is vacated because it violates the one-act one-crime rule.

¶ 2   Following a jury trial, the defendant, Perriyon King, was found guilty of multiple accounts

of attempted first-degree murder (720 ILCS 5/8-4(a) (West 2016) and one count of aggravated

battery (720 ILCS 5/12-3.05(e)(1) (West 2016)).  After several counts were merged with others, the defendant was sentenced to 90 years' imprisonment.  On appeal, the defendant raises challenges to both his convictions and his sentences.  We affirm in part, vacate in part, and modify the defendant's sentence.

¶ 3                                    I. BACKGROUND

¶ 4      On August 23, 2017, the defendant and his codefendant, Edmond Lilly, were charged by indictment with various counts related to a drive-by-shooting that occurred on April 5, 2017.  In relevant part, they were both charged with four counts of aggravated battery (720 ILCS 5/12-3.05(c)(1) (West 2016)), six counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)), thirteen counts of attempted first-degree murder (720 ILCS 5/9-1(a)(1) (West 2016); 720 ILCS 5/8-4 (West 2016)), and four counts of mob action (720 ILCS 5/25-1(a)(1) (West 2016)).  The record indicates that three of the four counts of aggravated battery against the defendant were dismissed on the State's motion.

¶ 5      On May 17, 2018, Lilly filed a third motion to sever the trial, arguing that he and the defendant would have antagonistic defenses.  In that motion, Lilly stated that, at trial, he planned to assert an alibi defense and argue that he was not with the defendant or present at the scene of the crime.  Lilly argued that there was evidence linking the defendant to the vehicle involved in the shooting and that it was quite likely that their defenses would be antagonistic to each other.

¶ 6      A hearing was held on Lilly's motion to sever.  The defendant's trial attorney was not present at the hearing.  Lilly's attorney stated that his position at trial would be that while there was evidence linking the defendant to the vehicle involved in the shooting, there was no connection between Lilly and the vehicle.  Further, Lilly's focus at trial would be to "not only prove the alibi, but to show that [the defendant was] the driver of the [vehicle]" involved in the shooting.  Lilly

asserted that it would be unfair to try him alongside the defendant because there was significant evidence linking the defendant to the vehicle involved in the shooting, and it would be difficult for the jury to separate that evidence when deliberating on a verdict as to Lilly.

¶ 7    Following argument, the trial court denied the motion to sever. The trial court noted that Lilly and the defendant were not accusing each other and Lilly had not identified any evidence he was planning to present against the defendant that was not already being presented by the State. The trial court acknowledged that, as the case proceeded, its decision on the motion to sever could be changed at any time.

¶ 8    On October 16, 2018, a jury trial commenced. Prior to testimony, the defendant's trial counsel stated that "[w]e did file motions for severance and we're just, again, standing on those motions that the Court should have severed the cases. Just to preserve it." The trial court responded that its earlier ruling would stand. The defendant and Lilly were tried together.

¶ 9    Marsha Griffin testified that, on April 5, 2017, shortly after 4 p.m., she and her husband, Richard Griffin, the victim, were driving northbound on Longwood in Rockford when the victim stopped the vehicle. The victim stated that he did not know what was happening but the vehicle in front of them was doing something. Marsha looked forward and saw two vehicles in front of them, a burgundy SUV and a blue SUV. The victim started to drive again and then she heard a loud bang. Marsha saw a big hole in the windshield. The victim said he thought it was a bullet. Then a second bullet came through the windshield and when Marsha looked over, the victim was slumped to the side. After the vehicle started to roll, Marsha pulled the emergency brake. Marsha called 911 and put her coat over the victim's forehead. The victim suffered a brain injury as a result of being shot in the head and is now living in a nursing home in an essentially vegetative state.

¶ 10    Sherry Stobart testified that, on April 5, 2017, shortly after 4 p.m., she was riding as a passenger in her red Nissan Pathfinder with her boyfriend, Tyrone Smith, who was driving. They were driving on Longwood toward the Loves Park bridge. A blue vehicle pulled up next to them, even though it was a one lane road, and motioned for her to roll down her window. After she rolled the window down, the vehicle pulled in front of them and an arm came out of the window on each side of the vehicle and started shooting at them. The vehicle was a dark blue Mazda with tinted windows and a license plate number that started with "Q." She had seen the defendant with the vehicle before. The defendant was associated with her boyfriend, Tyrone Smith. She had seen the defendant driving the vehicle a couple times within a month prior to the shooting. Stobart testified that she knew that Smith was having some type of conflict with the defendant at the time of the shooting.

¶ 11    Stobart further testified that once she heard the gunshots, she moved to the floor of the vehicle. She thought she was going to die. She asked Smith who was shooting at them and he responded, "P.K. and them." Once the gunshots stopped, she felt the vehicle go in reverse. They ended up on the other side of the Whitman bridge and then they went down by North Main street. She let Smith out of the vehicle, and then she drove to a parking lot and called the police. She initially told the police that she was driving because Smith had a warrant out for his arrest. She ultimately told the police that Smith was driving at the time of the shooting. Stobart identified pictures of her vehicle after the shooting. The pictures showed damage to the front and rear windshields. The rear windshield was completely missing.

¶ 12    On cross-examination by Lilly's attorney, Stobart testified that she asked Smith who was shooting at them and he said it was "P.K. and them." She met the defendant when she was selling her vehicle to Detravion Jones. The defendant was with Jones and was driving a blue Mazda SUV.

She testified that Smith and the defendant were friends but that they started having problems a week before the shooting.

¶ 13    On cross-examination by the defendant's trial counsel, Stobart admitted that her written statement she gave to police indicated that Smith had fired back at the blue Mazda. She also told the 911 operator that she was driving the vehicle during the shooting and that she was the only person in the vehicle. When she was taken back to the police station, she eventually told the police that Smith was driving the vehicle during the shooting. Stobart testified that she did not know whether Smith returned fire on the blue Mazda. She only told the officers that Smith returned fire because that is what the police led her to believe. They told her that there was gun powder residue in her vehicle and that they knew for a fact Smith was shooting back. Stobart said she did not know whether this was true because she was on the floorboard of the vehicle.

¶ 14    On redirect examination, Stobart testified that when the blue Mazda pulled up next to her vehicle on the day of the shooting and rolled down its window she saw the top part of the driver's head, his hat, and "like the top part of his face." When asked what she meant by "his," Stobart testified that she meant the "driver, [the defendant]."

¶ 15    Smith testified that he was currently incarcerated for attempted armed robbery and that he had prior felony convictions for driving with a suspended license, driving under the influence, and residential burglary. He claimed that he had received no consideration or promises for his testimony. Smith testified that, on April 5, 2017, in the afternoon, he and Stobart were driving to Machesney. He was driving Stobart's red Nissan Pathfinder. Stobart was in the front passenger seat. At some point, he observed a blue Mazda with tinted windows pull up next to him on the passenger side. The vehicle belonged to the defendant. He and the defendant were friends at one point but had an argument a couple days before the shooting. The basis for the argument was that

Smith was angry because the defendant had left a weapon in his vehicle. He was angry that the defendant left a weapon in his vehicle because his children were often in the vehicle and because he was a convicted felon and was not supposed to have any weapons. Smith refused to give the weapon back to the defendant and the defendant was angry about this.

¶ 16     Smith further testified that after the blue Mazda pulled up next to the Pathfinder, it pulled in front of him. He then saws arms come out of the windows and realized that people were shooting at them from the driver side and the passenger side of the Mazda. He heard between 10 and 25 gunshots. He stopped the vehicle, put it in reverse and drove over the median. When presented with a map of the area, Smith indicated that he was on North Longwood when the shooting started. After he reversed and went over the median, he was driving on Whitman Street. Smith denied shooting back at the blue Mazda. Smith said he was focused on trying to get away. Smith testified that, after the shooting stopped, he told Stobart that the defendant was shooting at them.

¶ 17     Smith identified various photos that were admitted into evidence depicting the vehicle after the shooting. The photos showed about five gunshots to the front windshield and two gunshots on the hood. The back window was shattered. Smith further testified that, after he drove over the Whitman Street bridge, he drove to North Main Street and asked Stobart to call the police. He had stopped by a gas station. He exited the vehicle because there were warrants out for his arrest.

¶ 18     Smith testified that he was from St. Louis and had gone back there after the shooting. On April 10, 2017, while he was in custody in St. Louis for resisting arrest, two Rockford police detectives, Detectives Robert Skaggs and Gabe Wassner, came to interview him. He was shown photo lineups on that day, but he did not identify anyone. He told the police that the defendant was not involved and that he was unable to identify anyone because the Mazda had tinted windows. Smith testified that he did not remember much from that interview because he had recently been

shot. He was in a wheelchair and did not want to be bothered with the police. At his request, the detectives came to interview him again on April 19, 2017. They again showed him a photo lineup of possible shooters. One of the pictures was of the defendant and Smith had circled it, identifying the defendant as the shooter.

¶ 19    On cross-examination by Lilly's attorney, Smith testified that he did not remember much from the first interview in St. Louis because he had been recently shot. Detective Skaggs and Wassner conducted a second interview about a week later. During that interview, he identified the vehicle involved in the shooting and stated that the defendant was the driver of the vehicle. Smith acknowledged that the detectives suggested that Lilly was also in the vehicle with the defendant, but Smith told them the other person in the vehicle was someone named "Jeff." Smith testified that he had known Jeff for many years. He described who Jeff was and other times when Jeff was arrested. Smith acknowledged being shown three photo lineups during the second interview and that the defendant was the only person he identified.

¶ 20    On cross-examination by the defendant, Smith denied that he had a gun or fired back at the blue Mazda. Smith acknowledged that the dispute with the defendant prior to the shooting was because Smith refused to return the defendant's gun. Smith also acknowledged that when detectives went to speak with him the first time in St. Louis, he told them he could not identify anybody involved in the shooting because of the tinted windows and the speed of the vehicle. He told the officers that the defendant was not involved and that he believed the defendant was incarcerated at the time of the shooting. He acknowledged being shown photo lineups during the first interview that contained a picture of the defendant and denying that the defendant was involved.

¶ 21    Detective Spencer Berke testified that on the day of the shooting he was called to Longwood and Rural to investigate the scene of a shooting. He found a .38 caliber shell casing, two different types of .45 shell casings, and two different types of .40 shell casings. The only difference in the different shell casings was the manufacturer. The different shell casings could be shot out of any gun that uses that size bullet.

¶ 22    Alexander Bustos Montalvan testified that he was a maintenance worker in an office building at 615 Longwood, near where the shooting took place on April 5, 2017. The office building had surveillance cameras. Montalvan testified that the cameras were working on the day of the shooting. He identified People's Exhibit 97A as a disk containing a video recording from the surveillance camera on April 5, 2017. He recognized the signature on the video along with the date that he reviewed it. The surveillance camera pointed west of the building toward Whitman Street. The videotape was played for the jury. At 4:31 p.m., it showed a red Nissan Pathfinder in the left-hand lane and a blue Mazda CX-7 in the right-hand lane.

¶ 23    Robert McCarty testified that he worked at 631 Longwood for a real estate company. On April 5, 2017, he heard multiple gunshots coming from the intersection of North Longwood and Rural streets. When he heard the shots, he jumped out of his chair and ran to the window. He saw three vehicles near the intersection. One vehicle was red and another was blue. He could not remember the color of the last vehicle but he described it in his 911 call. This last vehicle was moving erratically and went off the road and onto grass where it rolled to a stop. The red vehicle had overshot the Whitman street bridge exit, so it went in reverse, took a left turn and then drove across the bridge. He believed the blue vehicle continued north on Longwood but he could not remember for sure. On cross-examination, McCarty testified that the vehicle that went off the road onto the grass had driven past the red vehicle before it came to a stop.

¶ 24    Arlen Foss testified that, on April 4, 2017, he drove a friend of his, Joe McGuire, and a female to a house in Machesney Park near Fifth Avenue and Seventh Street to buy drugs. There were several vehicles in the driveway. A blue vehicle with tinted windows had backed in so that when Foss pulled in the driveway the front bumpers were facing each other. A person in the driver's seat of the blue vehicle made a hand motion. The female exited Foss's vehicle and entered the blue vehicle. After a couple minutes the female reentered Foss's vehicle. Foss testified that when the female was in the blue vehicle he had a bad feeling so he texted himself the license plate of the blue vehicle.

¶ 25    Foss further testified that, on April 5, 2017, he drove McGuire to an area near Ninth Street and Fifth Avenue to buy drugs. They parked on Fifth Avenue. A vehicle drove by and honked. It was the same blue vehicle from the day before. McGuire told Foss to follow the vehicle, which made a right turn into an alley. The vehicle stopped and Foss stopped a few feet behind the back bumper. McGuire exited Foss's vehicle and entered the blue vehicle. Foss could see the make and model of the vehicle so he texted it to himself. They left when McGuire returned to Foss's vehicle. Foss identified People's Exhibit 98 as a photograph of his cell phone showing the text messages he sent himself with the blue vehicle's license plate number, make, and model.

¶ 26    Foss testified that on the night of the shooting, he saw a picture of the vehicle on the Rockford scanner and on the news. He believed the broadcast included the license plate number. He looked at his cell phone and the license plate number he texted himself was the same license plate number that was being broadcast. He called the police and met with detectives the next morning. Foss showed the detectives his cell phone and they took pictures of it, which Foss identified as People's Exhibit 98. Foss testified that the license plate number he texted himself

was Q157593. The make and model he texted himself was Mazda CX-7. The time stamp on the text he sent himself the day of the shooting, from the alley, was 3:39 p.m.

¶ 27 McGuire testified that he was currently in custody in the Winnebago County jail for violating his probation for obstructing a peace officer. He also had prior convictions for retail theft and was a paid confidential informant for the Winnebago County Sheriff, but he testified that he did not receive any promises or consideration from the State in exchange for his testimony. McGuire admitted that he was a drug addict but testified that he had been sober for 10 days.

¶ 28 McGuire further testified that Foss was his friend. A few days before the shooting, Foss drove him to a house in Machesney Park. McGuire's other friend, a female, was also with them. McGuire was going to the house to buy drugs. He was supposed to meet someone named P.K. or Perriyon King, the defendant. When they reached the address, there was a blue Mazda in the driveway. Foss pulled into the driveway facing the Mazda. McGuire exited Foss's vehicle and entered the blue Mazda and purchased drugs from the defendant.

¶ 29 McGuire also testified that on the day of the shooting, April 5, 2017, Foss drove him to Ninth Street and Fifth Avenue so he could meet with the defendant again to buy drugs. When they reached the area, McGuire called the defendant and was instructed to follow the defendant's vehicle into an alley. McGuire exited Foss's vehicle and entered the back passenger side of the blue Mazda SUV to buy drugs. There was a man named Juan in the back seat of the vehicle and Lilly was in the front passenger seat. McGuire acknowledged that he did not know Lilly's name at that time. The defendant was driving the same blue Mazda as the day before.

¶ 30 The day after the shooting, McGuire was picked up by the police for solicitation and taken to the Winnebago County jail. He met some police officers in pre-booking who said they wanted to speak with him. The officers took him to another police station off of Broadway. He was

interrogated there about the shooting by Detectives Jiminez and Veruchi. When he spoke with them he was probably going through drug withdrawal and not feeling well. The detectives showed him two photo lineups with six people on each page. McGuire identified the defendant as the person driving the vehicle and whom he purchased drugs from prior to and on the day of the shooting. The police spoke with him again on April 7, two days after the shooting. He was probably clear headed for that interview. He was shown another photo lineup on that day and he identified Lilly as also being in the vehicle during the April 5th drug buy.

¶ 31 On cross-examination by Lilly's attorney, McGuire admitted he was a heroin addict and that he was likely suffering from withdrawal, in other words he was dope sick, when he spoke with the police on April 6, 2017. McGuire acknowledged that he testified that he viewed two different photo lineups on April 6. He also acknowledged that the written statement from his police interview indicated that he viewed three lineups on that day, and that he identified the defendant in one lineup and "Juan" from another lineup but did not recognize anyone from the third lineup. McGuire reiterated that during his April 5, 2017, drug buy in the blue Mazda there were three people—the defendant, "Juan," and another person he did not know the name of until later. The police told him the name of the third person in the vehicle. McGuire acknowledged that on April 7, when he identified Lilly as also being in the vehicle during the April 5th drug buy, he was actively using drugs.

¶ 32 Luther Thomas testified that he lived with the defendant's aunt and uncle. Thomas had known the defendant his entire life. The defendant called him uncle even though he was not blood related. Thomas said that he owned a 2007 blue Mazda CX-7, which he sold to the defendant in December 2016. Thomas still had the title in his own name but the defendant was paying him $150 every two weeks for the vehicle. Thomas testified that after December 2016 he never drove

the Mazda. The defendant was the primary user of the vehicle and Thomas saw the defendant driving it three or four times a week.

¶ 33   Thomas further testified that he was watching the news one day and saw a vehicle that looked like the one he had sold to the defendant. He could not remember the exact date but said it was the beginning of April 2017. Thomas identified People's Exhibit 101 as a picture of the blue Mazda CX-7 that he may have seen on the news. After seeing the vehicle on the news, Thomas called the defendant. He told the defendant he had seen the vehicle on the news and wanted to know what was going on. The defendant said he would call Thomas back. The defendant called back later that evening and told Thomas that he was in some trouble, but that he could not talk about it. A few days later, Thomas again spoke with the defendant over the phone. The defendant refused to tell him what was going on. When Thomas asked the defendant when he would get his money for the truck, the defendant said he would get him the money but did not say when.

¶ 34   Thomas testified that he had a third conversation with the defendant. The defendant told Thomas that, if anyone asked, he should deny that the defendant ever had the Mazda. When Thomas responded, "You did have the truck," the defendant said that somebody had stolen it. Thomas also testified regarding a fourth conversation. Thomas asked the defendant where the Mazda was and if it had been involved in the shooting. The defendant kept saying that the truck was stolen but that he would still pay Thomas for it. Thomas asked again where the truck was located and the defendant replied that the truck was destroyed and that it had been burned. Thomas said the police called him about his vehicle about two days after shooting.

¶ 35    On cross examination, Thomas said that the truck he saw on the news at the beginning of April looked like his truck. He acknowledged that he was concerned that the vehicle would be linked to him.

¶ 36    Detective Gibbons testified that he was a detective in the identification unit of the Rockford police department. On April 6, 2017, he was dispatched to the intersection of Brooke Road and River Boulevard to process a vehicle that was burned. When he arrived, he saw a burned-out hulk of a Mazda truck. Everything inside the Mazda was melted and burned away. The vehicle was still steaming. Gibbons identified pictures of the vehicle that were taken at the scene and the pictures were admitted into evidence. The vehicle was transferred to a secure impoundment garage and the truck's VIN was located on the vehicle at the garage.

¶ 37    Following the State's case, the trial court granted Lilly's motion for a directed verdict.

¶ 38    Thereafter, Detective Scot Mastroianni testified for the defendant that Stobart, in her written statement, claimed that she was driving the vehicle when the shooting occurred. She also stated that she saw Smith pull a gun out of his coat and shoot it. Detective John Wassner testified that it was police department policy to generally find someone without working knowledge of a case to administer photo lineups. However, he administered the photo lineup to Smith on April 19, 2017, in St. Louis, even though he was not an independent administrator. He did so because Smith had specifically requested to speak with Detectives Skaggs and himself. Wassner testified that when he showed the photo lineup to Smith, he did not point to anyone or suggest who Smith should identify.

¶ 39    During deliberations, that jury sent a note asking whether the witnesses had been coached. However, after a juror was excused, the trial court instructed the jury that the question was moot

and that they had to restart deliberations with the new juror. The next day, the jury found the defendant guilty on all charges.

¶ 40 Following a sentencing hearing, the trial court sentenced the defendant to 90 years' imprisonment. The trial court found it miraculous that there were not more victims based on the location and the barrage of bullets involved in the incident. The trial court recited many details from the presentence investigation report (PSI). Specifically, the PSI showed the defendant was formally involved in gang activity by age 11. His mother, who the defendant lived with in Minnesota, was afraid for herself and others in the family because of the defendant's gang involvement and thus sent the defendant to live with his father in Rockford. The situation became worse and the defendant was sent back to Minnesota. By age 13, the defendant had juvenile adjudication for fighting, assault, and trespassing. The defendant was sent to a residential counseling facility but was then involved in another assault and a felony. The defendant's probation was transferred to Rockford so that the defendant could be with his father. But shortly after the defendant's return, his father was arrested on federal drug charges and has remained in federal prison ever since. The defendant then had to live with his grandmother in Rockford. The defendant immediately had problems in school and although he was offered several different types of treatment, the defendant did not cooperate. There was a September 2016 charge for aggravated battery for which an attorney filed an appearance but the defendant did not appear in court until after the incident at issue in this case. At the time of the incident at issue, the defendant was being investigated for a March 2017 manufacture and delivery of heroin. The defendant pleaded guilty to both of those offenses six days before the bill of indictment was issued in this case.

¶ 41 The trial court noted that the PSI indicated the defendant had a good childhood and that his mother made a good home for him. In the PSI, the defendant indicated that he wanted to be a

mentor for young people. The trial court noted that this was an admirable goal but that the defendant did not seem so interested in this at the time of the crime. Rather, the defendant acted out of anger and revenge without regard for anyone's life, even innocent bystanders. The trial court stated that the defendant's actions on April 5, 2017, were "selfish, reckless, and brazen."

¶ 42    The trial court noted that none of the statutory factors in mitigation applied. As to non-statutory factors, the trial court considered the defendant's young age and his stated goal of wanting to be a mentor for young people. As to statutory factors in aggravation, the trial court considered that the defendant's conduct threatened serious harm to those involved as well as anyone walking or driving in the vicinity. The trial court also considered the defendant's history of delinquency and criminal activity, that the sentence was necessary to deter others, and the fact that the victim was over 60 years of age. As to non-statutory factors in aggravation, the trial court considered that the defendant had poor attendance in school, was involved in many fights, mistreated fellow students and staff, was unwilling to follow rules, defied authority, and was ultimately expelled.

¶ 43    The trial court further noted that, in the PSI, the defendant indicated that his behavior was the result of his father not being around. However, when he was sent back to Rockford to be with his father, his behavior worsened. The trial court also noted that the PSI addressed a psychological assessment that was conducted in Minnesota which described conduct disorder, ADHD, depression, and marijuana use disorder. Thereafter, multiple attempts were made to get the defendant help but the defendant was not cooperative. The trial court noted that when he was placed in a residential facility the defendant was described as being very invested in the gang lifestyle and that the defendant would go to great lengths to win the acceptance of older gang members including putting himself and others at risk.

¶ 44    The trial court noted that the PSI addressed a "Woodland Hills assessment." That assessment indicated that impulse control was not the defendant's issue. Rather, the defendant used anger or violence when he believed it was to his advantage. The trial court stated that this was demonstrated in the offense at issue. The defendant wanted revenge against Smith and had a disregard for anyone else that was in the vicinity at the time of the shooting.

¶ 45    The trial court stated that it considered the trial evidence, statements from the defendant's family, the victim impact statements, and the defendant's history, character, and attitude. The trial court considered the evidence presented and the arguments made by both parties. The trial court stated that it considered the statutory and non-statutory factors in aggravation and mitigation, even if it did not verbalize every factor. The trial court stated that it considered and read the PSI multiple times. The trial court noted that attempting to take someone's life was the most serious of offenses. The trial court commented that the defendant was given multiple opportunities to walk away from the gang lifestyle but failed to do so. The trial court noted that the defendant pleaded guilty to delivering heroin, which also showed an extreme disregard for the community and human life.

¶ 46    In consideration of the foregoing, the trial court imposed sentence. On the attempted murder of Richard Griffin, the trial court imposed a 25-year prison sentence plus a 30-year firearm enhancement. On the attempted murders of Marsha Griffin, Stobart, and Smith, the trial court imposed three concurrent sentences of 15 years' imprisonment plus a 20-year firearm enhancement, to run consecutive to the sentence for attempted murder of Richard Griffin. Finally, the trial court imposed a 15-year sentence for aggravated battery, to run concurrent to the terms of imprisonment for the attempted murder of Marsha Griffin, Stobart, and Smith. Following the denial of his motion to reconsider his sentence, the defendant filed a timely notice of appeal.

¶ 47                          II. ANALYSIS

¶ 48          A. Sufficiency of the Evidence and 30-year Firearm Enhancement

¶ 49    The defendant's first contention on appeal is that he was not proved guilty beyond a reasonable doubt of attempted first-degree murder.  When a defendant challenges the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *People v. Belknap*, 2014 IL 117094, ¶ 67.  The reviewing court's role is not to retry the defendant.  *People v. Gray*, 2017 IL 120958, ¶ 35.  Rather, it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts.  *Id.*  Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. *Id.*  " 'The mere existence of conflicting evidence at trial does not require a reviewing court to reverse a conviction.' "  *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (quoting *People v. Goodar*, 243 Ill. App. 3d 353, 357 (1993)).  A defendant's conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt.  *Belknap*, 2014 IL 117094, ¶ 67.

¶ 50    Circumstantial evidence is sufficient to sustain a conviction.  *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).  In assessing circumstantial evidence, the trier of fact is not required to disregard inferences that normally follow from the evidence.  *Id.*  Rather, to sustain a conviction, "[i]t is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt."  *Id.*

¶ 51    A person commits attempted first-degree murder when, acting with the intent to kill or do great bodily harm, he completes an act that constitutes a substantial step toward the commission of first-degree murder.  720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016).  While the act of firing a gun,

without more, is not sufficient to prove the specific intent to kill, circumstances demonstrating that the defendant acted with malice or a complete disregard for human life when he discharged a firearm at another person support the conclusion that the defendant possessed the specific intent to kill. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39.

¶ 52    Viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to establish that the defendant was guilty of attempted first-degree murder. There was sufficient circumstantial evidence that the defendant was the driver of the vehicle. Smith testified that he knew the vehicle from which the shots were fired was the defendant's vehicle because he and the defendant were friends. Stobart testified that the vehicle shooting at them had a license plate number that started with "Q" and she had seen the defendant driving the vehicle a couple times within months prior to the shooting. McGuire testified that on the day of the shooting he purchased drugs from the defendant, who was driving a blue vehicle. Foss's testimony and text messages to himself established that when McGuire purchased the drugs from the defendant on the day of the shooting, it was about 50 minutes before the shooting occurred and the blue Mazda that the defendant was driving had a license plate number that started with "Q." Thomas testified that he sold a blue Mazda with tinted windows to the defendant and that, after the day of the shooting, he had phone conversations with the defendant wherein the defendant stated he was in trouble, that Thomas should not tell anyone the defendant had the truck, and that the truck was destroyed and burned. Finally, Smith and Stobart testified that they were being shot at from both the driver's side and passenger side of the blue Mazda. This circumstantial evidence was sufficient to establish that the defendant was the driver of the vehicle involved in the shooting and that he was one of the shooters. Moreover, the jury was instructed that the defendant could be found guilty of attempted first-degree murder on an accountability basis. See *People v. Cooper*, 194 Ill.

2d 419, 435 (2000) (a defendant may be found guilty on an accountability theory even though the identity of the principal is unknown). Thus, even if the defendant was just driving the vehicle and was not actually one of the shooter's, there was still sufficient evidence to prove him guilty of attempted first-degree murder on the basis of accountability.

¶ 53 The defendant makes many arguments to undermine the evidence in this case. He argues that Thomas's testimony was not credible because he still owned the blue Mazda and feared being implicated in the shooting. He attacks McGuire's credibility on the basis that he was a drug addict and was likely going through withdrawal when he spoke to the police. He notes that when Smith first spoke to the police on April 10, 2017, he denied that the defendant was involved but then changed his story when he spoke to the police on April 19, 2017. The defendant also notes that the photo lineup shown to Smith was not given by an independent administrator. Finally, he points out that the State did not connect the VIN of the burned-out Mazda with that of the defendant's vehicle. However, the jury was well aware of all these alleged weaknesses in the evidence. It was the function of the jury to observe the demeanor of the witnesses and judge their credibility and resolve any conflicts in the evidence. *Gray*, 2017 IL 120958, ¶ 35. Our review of the record reveals there was sufficient evidence for the jury to conclude that the defendant was guilty of attempted first-degree murder and the evidence was not so unreasonable as to justify a reasonable doubt of the defendant's guilt. See *People v. Baugh*, 358 Ill. App. 3d 718, 737 (2005) (a defendant's arguments regarding the sufficiency of the evidence are unpersuasive to the extent "the weaknesses in the evidence that defendant cites on appeal were all presented to, and rejected by, the [trier of fact].").

¶ 54 Alternatively, the defendant argues that this Court should vacate the 30-year firearm enhancement for personally discharging a firearm that caused great bodily harm during the

attempted murder of Richard Griffin because the State failed to prove that he, rather than his co-defendant, fired the shot that injured the victim.

¶ 55    Attempted first-degree murder is a Class X felony (720 ILCS 5/8-4(c)(1) (West 2016)), that carries a sentencing range of not less than 6 years and not more than 30 years (730 ILCS 5/5-4.5-25(a) (West 2016)).  Section 8-4(c)(1) of the Code provides for three firearm enhancements for a sentence of attempted first-degree murder:

"(B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;

(C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;

(D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court."  720 ILCS 5/8-4(c)(1) (West 2016).

¶ 56    The State concedes that the 30-year firearm enhancement should be vacated because it failed to prove that the bullet that struck Richard Griffen was actually fired from the defendant's gun as opposed to being fired from the passenger's gun.  The State further argues, however, that a 20-year firearm enhancement should be imposed in its stead.  We accept the State's concession and modify the defendant's sentence accordingly.  See Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967) (a reviewing court may reduce the punishment imposed by the trial court); *People v. LaVelle*, 396 Ill. App. 3d 372, 385 (2009) (reducing felony murder sentencing enhancement for proximately

causing victim's death to sentencing enhancement for personally discharging a firearm during the commission of the offense); *People v. Jones*, 168 Ill. 2d 367, 378 (1995) (reviewing court has the authority to reduce a criminal sentence); see also *People v. Flynn*, 2012 IL App (1st) 103687, ¶ 35 (noting that similar provision of the Unified Code of Corrections for 20-year enhancement for first degree murder is applicable to the accountable defendant, who personally discharged a firearm but may not have fired the actual shot that hit the victim).

¶ 57                                    B. Hearsay Testimony

¶ 58    The defendant's second contention on appeal is that the trial court erred in admitting hearsay testimony. The defendant argues that it was error to allow Smith's statement that it was "P.K. and them" who were shooting at Stobart's vehicle. The defendant also argues that it was error to allow Foss to testify that the license plate number he saw on a newscast was the one he texted himself the day before the shooting. The defendant acknowledges that these claims of error are forfeited because defense counsel did not raise them in a posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but he argues that the errors can be reviewed under the plain-error doctrine or as claims for ineffective assistance of counsel.

¶ 59    The plain error doctrine allows a reviewing court to consider an unpreserved error where either (1) a clear error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear error occurs that is so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *People v. Jackson*, 2021 IL App (1st) 180672, ¶ 21.

¶ 60    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v.*

*Washington*, 466 U.S. 668, 688 (1984). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 61    Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced. Specifically, the defendant must show that the evidence was so closely balanced that the alleged error alone tipped the scales of justice against him, *i.e.*, that the verdict "resulted from the error and not the evidence" properly adduced at trial (see *People v. Herron*, 215 Ill.2d 167, 178 (2005) (plain error)); or that there was a "reasonable probability" of a different result had the evidence in question been excluded (see *Strickland*, 466 U.S. at 694). *People v. White*, 2011 IL 109689, ¶ 133.

¶ 62    In the present case, assuming arguendo that the alleged hearsay statements were improper, the defendant's argument has no merit because he was not prejudiced by the claimed errors. Even absent Smith's statement that "P.K. and them" were the people shooting at him, or Foss's testimony that the vehicle he saw on the newscast had the same license plate number that he texted himself, there was other significant circumstantial evidence that the defendant's vehicle was involved in the offense and that the defendant was the driver. See *People v. Plair*, 51 Ill. App. 3d 75, 80 (1977) ("Admission of hearsay evidence is not prejudicial where that evidence is merely cumulative and where the accused's guilt is sufficiently established by proper evidence."). Stobart testified that the blue vehicle that pulled up next to her and whose occupants began to shoot at them was a dark blue Mazda with a license plate that started with "Q." She knew it was the defendant's vehicle because the defendant was an associate of Smith and she had seen the defendant driving the vehicle on other occasions prior to the shooting. Smith also testified that he

and the defendant had been friends and that the vehicle belonged to the defendant. Foss testified that he had taken his friend McGuire to make a drug purchase from a blue Mazda on the day before and the day of the shooting. He testified that the vehicle involved was a blue Mazda with a license plate number that starts with "Q." McGuire testified that when he entered the vehicle about 50 minutes prior to the shooting, the defendant was in the driver seat. Finally, Thomas testified that he sold a blue Mazda to the defendant and the defendant told him that the car had been burned. The police called Thomas after they collected the VIN on a burned-out blue Mazda. Based on the foregoing evidence, even if the admission of the hearsay statements at issue was improper, the statements were merely cumulative and not prejudicial. *Id.*

¶ 63                                  C. Motion to Sever

¶ 64     The defendant's next contention on appeal is that the trial court erred in refusing to sever the defendant's and Lilly's trials. The State argues that this issue is forfeited because the defendant did not join in Lilly's pretrial motion to sever and thus raised the issue for the first time in his motion to reconsider.

¶ 65     "The purpose of a motion to reconsider is to bring to the court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law." *Evanston Insurance Company v. Riseborough*, 2014 IL 114271, ¶ 36. Generally, new legal arguments raised for the first time in a motion to reconsider are deemed forfeited. See, *e.g.*, *American Chartered Bank v. USMDS, Inc.*, 2013 IL App (3d) 120397, ¶ 13 ("Issues cannot be raised for the first time in the trial court in a motion to reconsider and issues raised for the first time in a motion to reconsider cannot be raised on appeal). However, there is authority supporting the proposition that a trial court has the discretion to consider a new issue raised for the first time in a motion to reconsider when a party has a reasonable explanation

for why he or she did not raise the issue earlier in the proceedings. *Delgatto v. Brandon Associates, Ltd.*, 131 Ill. 2d 183, 195 (1989).

¶ 66 The defendant argues that we must assume that the trial court found a reasonable explanation to excuse the forfeiture because (1) he raised the issue in his posttrial motion, (2) the State brought the forfeiture to the trial court's attention at the hearing on the motion, and (3) the trial court nonetheless ruled on the issue by denying the motion to reconsider. However, a review of the record reveals that the defendant never provided any reason for not joining Lilly's motion. At oral argument, defense counsel asserted that the defendant had adopted Lilly's motion prior to trial. However, the record does not support that assertion. Prior to trial, defense counsel stated in court that "[w]e did file motions for severance" and that he was "standing on those motions." In the motion for reconsideration, defense counsel stated that the trial court "erred in denying the Motion for Severance as to the Co-Defendant." At the hearing on the motion to reconsider, defense counsel stated that "there was a motion to sever the defendants from each other at the time of trial." Despite these statements, the defendant did not file a motion to sever, was not present at the hearing on Lilly's motion to sever, and never stated that he wanted to adopt Lilly's motion to sever. Accordingly, the defendant's argument that the trial court erred in failing to sever the trials is forfeited.

¶ 67 The defendant argues that if the issue is forfeited then we should address the issue as a claim for ineffective assistance of counsel, namely, that trial counsel was ineffective in failing to join in Lilly's motion to sever. In determining whether counsel was ineffective we must determine whether the defendant was prejudiced by the joint trial. *Strickland*, 466 U.S. at 694.

¶ 68 A defendant does not have a right to be tried separately from his codefendants when charged with an offense arising out of a common occurrence. *People v. Byron*, 116 Ill. 2d 81, 92

(1987). Rather, a defendant must show that he or she would be prejudiced by a joint trial. *People v. Bean*, 109 Ill. 2d 80, 92 (1985). Severance is required not only when a defendant makes an out-of-court statement implicating a codefendant, but also when codefendants' defenses are so antagonistic that one of the codefendants cannot receive a fair trial. *Id.* at 93. "Actual hostility between the two defenses is required." *Id.* Actual hostility occurs when there is "true conflict, such that each defendant professes his own innocence and condemns the other." *People v. Lovelady*, 221 Ill. App. 3d 829, 836 (1991), citing *People v. Adams*, 176 Ill. App. 3d 197, 200 (1988).

¶ 69 The defendant contends that Lilly's defense was antagonistic to his defense because, during cross-examination of Stobart, Smith, and McGuire, Lilly emphasized the identification of the defendant as the shooter, thus resulting in the defendant having to defend himself against both the State and the codefendant. In other words, he suffered prejudice because evidence was being presented against him by two parties.

¶ 70 The defendant notes that during Lilly's cross-examination of Stobart, she testified that she had seen the defendant driving the "blue Mazda Crossover SUV" on prior occasions just weeks before the shooting. The defendant argues that this testimony was prejudicial because, on direct examination, Stobart identified the shooter's vehicle only as a "blue car" and, thus, the cross-examination solidified the make and model of the defendant's vehicle. This argument has no merit because, on direct examination, Stobart testified that the shooter's vehicle was a blue Mazda with tinted windows and a license plate that started with "Q." Further, Lilly's cross-examination of Stobart was not so prejudicial to warrant severance because the shooter's vehicle was also identified as belonging to the defendant through the testimony of Smith, Foss, and McGuire.

¶ 71    The defendant argues that Lilly's cross-examination of Stobart was prejudicial in that Lilly's defense counsel also elicited the testimony that Smith stated the shooters were "P.K. and them."  However, this was not so prejudicial in that it was already elicited on direct examination and there was other circumstantial evidence that the vehicle belonged to the defendant.  Finally, the defendant argues that Lilly's cross-examination of Stobart was prejudicial because she testified that Smith and the defendant were having problems leading up to the time of the shooting.  However, Smith also testified that he was friends with the defendant and that they had a disagreement about a week before the shooting.  Thus, Stobart's testimony as to motive for the defendant to shoot at them was cumulative to that of Smith.

¶ 72    The defendant argues that Lilly's cross-examination of Smith was prejudicial because Smith reiterated that the defendant was the driver of the vehicle.  As this testimony was cumulative to Smith's testimony on direct examination, and there was other evidence that the defendant was the driver of the vehicle, we cannot say that the defendant suffered prejudice.  The defendant takes exception to Smith's testimony, during Lilly's re-cross examination, that he "never said to [the police] I can't say who was in the vehicle.  I don't know if it's Jeff or anyone else."  The defendant argues that this directly contradicted the impeachment testimony elicited during the defendant's cross-examination of Smith, where Smith acknowledge that, during the first interview in St. Louis, he told the detectives he could not identify anyone in the blue Mazda because of the tinted windows and the speed of the vehicle.  However, when the re-cross examination is read in context, the quoted statement at issue was elicited solely to show that the other person in the vehicle was not Lilly and there was no reiteration that the defendant was inside the vehicle.  Thus, the re-cross was not prejudicial.

¶ 73    Finally, the defendant argues that Lilly's cross-examination of McGuire was prejudicial because Lilly elicited testimony from McGuire of a prior written statement that indicated that he viewed three photo lineups on April 6, rather than just the two he testified about. During that examination, McGuire reiterated that he identified the defendant and someone named Juan as being in the vehicle during the April 5th drug buy prior to the shooting. This was not so prejudicial as to warrant severance. Our review of the record indicates that the tone of this cross examination was not to point a finger at the defendant. Lilly's cross-examination of McGuire was brief and despite eliciting repetitive testimony that McGuire identified the defendant as the driver of the vehicle during the April 5th drug buy, the focus of Lilly's cross-examination was to show that McGuire did not initially identify Lilly as being present on the day of the shooting.

¶ 74    In arguing that he was prejudiced by the joint trial the defendant relies on *People v. Rodriguez*, 289 Ill. App. 3d 223 (1997). In that case, two codefendants were tried jointly before separate juries for a shooting that left one person dead and another paralyzed. *Id.* at 225. At the trial, several occurrence witnesses recanted earlier statements identifying the codefendant as the shooter and testified that the defendant was the shooter. *Id.* at 236. Accordingly, at trial, the defendant argued that the witnesses' recanted statements were true and that their trial testimony was untruthful, while the codefendant argued that the trial testimony was the truth. *Id.*

¶ 75    On review, this court held that the defenses were antagonistic because by arguing that the witnesses were telling the truth at trial, the codefendant was essentially presenting evidence that the defendant was the shooter. *Id.* This court noted that the State essentially had two bites at the apple because "[t]he net result produced the State and [codefendant] on one side and defendant on the other with respect to the occurrence witnesses." *Id.* at 237. In other words, the defendant was

defending against his codefendant's theory of the case and the jury could have concluded that the occurrence witnesses' trial testimony was truthful because it was presented by two parties. *Id.*

¶ 76 The defendant's reliance on *Rodriguez* is unpersuasive. In *Rodriguez*, the defendant and codefendant were directly at odds because each of their arguments essentially pointed the finger at the other. As noted by this court, the two were essentially presenting evidence against each other. *Id.* at 236. That scenario is not present in this case and the defenses here were not antagonistic. Lilly asserted an alibi defense and the defendant asserted a presumption of innocence. The jury could have found that there was no evidence that Lilly was in the blue Mazda and also found that there was not sufficient evidence to conclude that the blue Mazda belonged to the defendant. Lilly did not present any additional evidence against the defendant that was not already presented by the State and Lilly's theory of the case did not point the finger at the defendant. Unlike *Rodriguez*, the trial did not become a contest between the codefendants. Accordingly, as the defendant was not prejudiced by the joint trial, defense counsel was not ineffective in failing to join Lilly's motion to sever.

¶ 77                              D. Prosecutorial Error

¶ 78 The defendant's next contention on appeal is that the State committed prosecutorial error by repeatedly misstating the evidence on a critical aspect of the State's case. The defendant notes that, in rebuttal closing argument, the State maintained that the blue Mazda involved in the shooting was the same vehicle that was involved in the April 5th drug buy, that Thomas sold to the defendant, and that was recovered the day after the offense. The defendant contends that there was no evidence to support this conclusion.

¶ 79 During closing arguments, attorneys are permitted wide latitude. *Wilson v. Moon*, 2019 IL App (1st) 173065, ¶ 46. "Closing arguments must be based on facts in evidence or upon reasonable

inferences which can be drawn from these facts." *People v. Hamilton*, 100 Ill. App. 3d 942, 953-54 (1981). Evidentiary rulings regarding objections to comments made during closing argument are within the discretion of the trial court, and any error will warrant reversal only if the comments were substantially prejudicial or affected the outcome of the case. *People v. Simmons*, 198 Ill. 2d 541, 568 (2002).

¶ 80    Moreover, "[i]mproper comments do not constitute reversible error unless they were so prejudicial that defendants were deprived of a fair trial." *Denton v. Universal Am-Can, Ltd.*, 2019 IL App (1st) 181525, ¶ 48. "A new trial is not warranted based on an improper opening statement or closing argument unless, when the trial is viewed in its entirety, the argument resulted in substantial prejudice to the losing party or rose to the level of preventing a fair trial." *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84. Substantial prejudice is such that the result of the trial would have been different absent the complained-of remark. *Id.*

¶ 81    Our supreme court has alternatively held that whether a prosecutor's misstatements and improper remarks denied the defendant a fair trial is reviewed for an abuse of discretion (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)) and *de novo* (*People v. Wheeler*, 226 Ill. 2d 92, 121 (2007)). The defendant acknowledges that his argument as to prosecutorial error was not raised in his posttrial motion and the claim is thus forfeited. He requests, however, that we review the error under the plain-error doctrine as the evidence was closely balanced. Under the plain error doctrine, and notwithstanding which standard of review we apply, we conclude that defendant was not deprived of a fair trial.

¶ 82    The defendant's contention is based on the following. In closing argument, defense counsel argued that there was nothing connecting the burned-out vehicle to Thomas's vehicle. Defense counsel noted that there was evidence that the VIN was collected from the burned vehicle

but there was no evidence tying the VIN to Thomas or the shooter's vehicle. In response, the State made the following comments in rebuttal:

"MR. BRUN [(ASSISTANT STATE'S ATTORNEY)]: And yet, he came before you—and also the last conversation he had with [the defendant], "Where is that car?" "It's destroyed," says [the defendant], "it got burned. Had some evidence in it."

MR. JAZWIEC [(DEFENSE ATTORNEY)]: Objection, your Honor.

THE COURT: The jury is to remember—use their own memory of the evidence as it was presented.

MR. BRUN: Once, again, the defense again trying to dissuade you, or I should say take you down a parallel path of somebody of relevance. The fact remains, the VIN number, do we have a VIN number from the Secretary of State saying it belonged to Luther? What did Luther tell you? "I got a call from the cops that they found my car." How did the police locate—why did the police call Luther? Reasonable inference, circumstantial evidence. Draw your own conclusions. The only way the police reached out to Luther was VIN number located, tracked it down—

MR. JAZWIEC: Objection, your Honor.

MR. BRUN: —let's call the registered owner. Draw your own reasonable inferences from the facts.

THE COURT: Jury obviously has the evidence. Arguments and suppositions of the attorneys are simply arguments and you are to disregard arguments of counsel that do not comport with your memory of the evidence and make a decision on that standpoint."

¶ 83 The defendant first argues that the statement that the vehicle "got burned. Had some evidence in it" was improper. We disagree. Thomas testified that the defendant told him the

vehicle was burned and destroyed. Further, the comment that it was burned because it had evidentiary value was a reasonable inference based on the evidence at trial. The evidence showed that a blue SUV was involved in the shooting and Smith and Stobart both testified that the shooter's vehicle belonged to the defendant. Further, Thomas testified that he sold a similar blue SUV to the defendant and the defendant told Thomas that he was in trouble. Further, to the extent the "had some evidence in it" comment was improper, the trial court's instruction to the jury to rely on their recollection of the evidence was sufficient to cure the error. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 60.

¶ 84 The defendant also argues that the State's comments about the VIN were improper because there was no evidence tying the VIN from the burned vehicle to Thomas or the defendant. However, these comments were also a reasonable inference from the evidence. Detective Gibbons testified that he was called to the scene of a burned blue Mazda on April 6, 2017. The vehicle was transferred to an impoundment garage and the VIN was located. Thomas testified that the police called him the next day about his vehicle. It is reasonable to infer that the burned vehicle belonged to Thomas since the police called Thomas the day after it was recovered and the defendant told Thomas that the vehicle had been burned.

¶ 85 The defendant also complains about a comment in rebuttal closing where the State indicated that the defendant told Thomas that "[he] had to burn it." Defense counsel objected and the trial court instructed the jury to use their own memory of the evidence. The State's attorney then corrected himself and stated that "The car was burned." Based on the trial court's instruction and that State's attorney correcting himself, this comment did not deprive the defendant of fair trial. Finally, based on our review of the record, we hold that even if any of the complained of

comments were improper, they were not so inflammatory as to affect the outcome of defendant's trial.

¶ 86                                    E. Sentencing Errors

¶ 87    The defendant's fifth contention on appeal is that his *de facto* life sentence is unconstitutional because, as applied to him, it violates the proportionate-penalties clause of the Illinois Constitution. See Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."). Alternatively, the defendant argues that his sentence is excessive and resentencing is warranted because the trial court considered improper factors and failed to consider his rehabilitative potential.

¶ 88    The State argues that the defendant forfeited his as-applied constitutional challenge to his sentence because he did not raise it below. The defendant argues that we should review his claim for plain error. We decline to do so. In *People v. Figuerao*, 2020 IL App (2d) 160650, ¶¶ 86, 89 (citing *People v. Harris*, 2018 IL 121932, ¶¶ 38-39) this court held that an as-applied challenge is premature where the defendant did not raise the claim below, the trial court did not hold an evidentiary hearing on the matter, and the trial court did not make findings of fact with respect to the issue. In *Harris*, our supreme court stated that "[a]ll as-applied challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Harris*, 2018 IL 121932, ¶ 39. As explained by this court in *Figueroa*:

> "The court in *Harris* rejected the motion that the basic personal information about the
> defendant that was discernable from the presentence investigation report provided a basis

for evaluating an as-applied constitutional challenge. [Citation]. The court declined to remand the matter for an evidentiary hearing but noted that the defendant could pursue his claim either in a postconviction petition or in a proceeding pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). [Citation]." *Figueroa*, 2020 IL App (2d) 160650, ¶ 86.

¶ 89 In the present case, the defendant did not raise his as-applied challenge before the trial court. The trial court thus did not hold an evidentiary hearing or make findings of fact with respect to the issue. As such, the record was not sufficiently developed for us to consider the as-applied challenge the defendant raises on appeal. Consistent with *Harris* and *Figueroa*, we do not intend for our disposition to preclude the defendant from advancing his claim through other available proceedings. *Harris*, 2018 IL 121932, ¶ 48; *Figueroa*, 2020 IL App (2d) 160650, ¶ 89.

¶ 90 We thus turn to the defendant's alternative argument that resentencing is warranted because the trial court considered improper factors and failed to consider his rehabilitative potential. Imposition of a sentence is normally within a trial court's discretion (*People v. Jones*, 168 Ill. 2d 367, 373 (1995)), and there is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, such that the trial court's sentencing decision is reviewed with great deference. *People v. Dowding*, 388 Ill. App. 3d 936, 942-43 (2009). Nonetheless, the question of whether a court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*. *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008). The burden is on the defendant to affirmatively establish that the sentence was based on improper considerations. *People v. Conley*, 118 Ill. App. 3d 122, 133 (1983). "In determining whether the trial court based the sentence on proper aggravating and mitigating

factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *Dowding*, 388 Ill. App. 3d at 943.

¶ 91 The defendant argues that the trial court abused its discretion because it did not sufficiently consider his troubled childhood, his cognitive disability, and his rehabilitative potential. The record belies these assertions. The record demonstrates that the trial court reviewed the PSI in great detail. The trial court discussed the defendant's troubled childhood, his mother's attempts to make a better home for him in Minnesota, and his difficulties in school. Further, in denying the motion to reconsider his sentence, the trial court considered the defendant's rehabilitative potential but found that the defendant had been offered help and counseling numerous times but had never availed himself of those opportunities.

¶ 92 The defendant argues that the trial court improperly considered his school disciplinary record without accounting for his race and studies indicating that racial minorities are disciplined more often and more harshly. However, there is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider all relevant factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998). Here, there is no indication in the record that the trial court did not consider the defendant's race or other factors related to his school disciplinary record. The defendant's argument is thus without merit.

¶ 93 Finally, the defendant argues that the trial court erred in relying on a psychological assessment that was never admitted into evidence and was outdated and relying on evidence that was not within the record. While the entire psychological assessment referred to was not admitted into evidence, parts of it were discussed in the PSI. The trial court properly relied on the portions of the psychological assessment that were included in the PSI and the trial court was aware, and

thus presumably considered, that the assessment was completed when the defendant was 15 years old. As to considering evidence not in the record, the defendant is referring to the trial court's statement that the defendant knew about his 2016 charge for aggravated battery at the time of the present incident because an attorney had entered an appearance in the case. The defendant notes that there was nothing in the record to show that an appearance had been filed. The defendant has not cited any case to show that this would be reversible error. Further, the charge and sentence for the aggravated battery was included in the PSI and considering the aggravated battery occurred prior to the incident in this case, it is obvious that the defendant was aware of the offense. Accordingly, the defendant has failed to establish that his sentence was based on improper considerations.

¶ 94                          F. Violation of One-Act, One-Crime Rule

¶ 95     The defendant's final contention on appeal is that his conviction for aggravated battery violates the one-act, one-crime rule and should be vacated. Specifically, the defendant argues that his conviction and sentence for attempted first-degree murder of Richard Griffin was based on the same physical act as the conviction and sentence for aggravated battery. Under the one-act, one-crime rule, a defendant may not be convicted of more than one offense "carved from the same physical act." *People v. King*, 66 Ill. 2d 551, 566 (1977). While the defendant did not raise this contention below, the State concedes that it is not forfeited as our supreme court has held that violations of the one-act, one-crime rule "fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process." *People v. Coats*, 2018 IL 121926, ¶ 10. We thus address the defendant's argument under the second prong of the plain error doctrine. The State concedes that the defendant's conviction and sentence for aggravated battery violates the one-act, one-crime principle. We accept the State's concession,

and we vacate the defendant's conviction of aggravated battery, the less serious offense. See *People v. Artis*, 232 Ill. 2d 156, 169-70 (2009).

¶ 96                                                    III. CONCLUSION

¶ 97    For the reasons stated, we vacate the defendant's conviction and sentence for aggravated battery, we affirm the defendant's remaining convictions, and we modify his sentence for attempted first-degree murder of Richard Griffin by reducing the firearm enhancement from 30 years to 20 years. The defendant's total sentence is therefore reduced from 90 years' imprisonment to 80 years' imprisonment.

¶ 98    Affirmed in part and vacated in part; sentence modified.